**In the Interest of E.M.N.,
a child, Appellant.**

No. 2–06–319–CV.

Court of Appeals of Texas,
Fort Worth.

April 5, 2007.

Richard A. Gladstone, Fort Worth, for appellant.

D. Lee Thomas, Jr., Fort Worth, for appellee.

Panel B: DAUPHINOT, HOLMAN and McCOY, JJ.

## OPINION

DIXON W. HOLMAN, Justice.

In two issues, appellant Donna Lynn J. appeals the termination of her parental rights to E.M.N., asserting that termination under section 161.001(1)(T) of the family code violated her right against the imposition of ex post facto laws and that there was insufficient evidence to show that termination was in the best interest of the child. We affirm.

## BACKGROUND

E.M.N. was born on August 27, 1999; she was almost seven years old at the time of the termination trial. Appellant testified that E.M.N. was her "miracle child" because Appellant was addicted to cocaine while pregnant with E.M.N.; within the same context, Appellant made reference to an abusive relationship with E.M.N.'s father.[1] The 2001 order establishing E.M.N.'s paternity appointed Appellant possessory conservator and joint managing conservator with E.M.N.'s father and restricted E.M.N.'s primary residence to Tarrant and Johnson counties.

Appellant was arrested in November 2002 for her involvement in the murder of E.M.N.'s father the previous September. E.M.N. was three years old at the time. After her arrest, Appellant initially placed E.M.N. and J.J., E.M.N.'s older half-sister, with Appellant's brother. She later arranged for them to stay with her father in New Mexico, but he became ill.[2] The New Mexico equivalent of the Texas Department of Family and Protective Services placed E.M.N. and J.J. with unrelated foster parents, who were known to Appellant, at Appellant's request. Appellant pled guilty to murder, was convicted, and received fifteen years' confinement in March 2004.[3] She testified that she would be eligible for parole in 2010.

---

1. Appellant testified about her history with abusive men. She also testified that her brother had given J.J. a black eye and that she would understand if her daughters were afraid of him.

2. New Mexico's equivalent of Texas's Child Protective Services ("CPS") picked up E.M.N. and J.J. when Appellant's father passed out in his truck in a parking lot. Appellant's father suffered a transient ischemic attack, a medical condition, while on the witness stand at the termination trial.

3. Appellant's mother pled guilty to the same offense, was convicted, and received thirty

years' confinement. E.M.N.'s amicus attorney asked Appellant, "Do you recall that you made a comment about a juncture in which you could have made a choice ... [when] you were in the middle of being tried for this ... murder, that ... you could either pick your mother or your children, ... what did you tell me you picked?" Appellant replied, "I chose not to testify against my mom," acknowledging that she knew at that point that she was hurting her children and herself. Appellant's father testified that he thought another man, who was with Appellant and his wife, shot E.M.N.'s father, and that he did not think Appellant and his wife had done it.

In 2003, legal proceedings over custody of E.M.N. began in Texas and New Mexico. E.M.N.'s paternal grandmother, Appellee, eventually prevailed in Texas, and Appellant was removed as E.M.N.'s managing conservator.[4] Appellee, her niece Martha Jo K., and Martha's husband Tony, were appointed temporary joint managing conservators of E.M.N. in January 2006. J.J. remained with the foster family in New Mexico.[5]

While in prison, Appellant sent letters, cards, gifts, and occasionally money to E.M.N., and took a number of self-improvement courses. Appellee filed a petition to terminate Appellant's parental rights to E.M.N. in February 2006. Appellant's parental rights to E.M.N. were terminated on September 7, 2006, after the trial court concluded that the involuntary termination requirements of section 161.001 of the Texas Family Code had been met. TEX. FAM.CODE ANN. § 161.001 (Vernon Supp.2006). Specifically, the court based its decision upon the only grounds brought by Appellee: section 161.001(1)(T), which provides for termination when a parent has been convicted of the murder of the other parent of the child under section 19.02 or 19.03 of the penal code and when the best interest of the child requirement under section 161.001(2) is satisfied. *Id.* § 161.001(1)(T), (2). Appellant had been convicted of murder under section 19.02(b)(1) of the penal code, for "intentionally or knowingly caus[ing] the death of an individual." TEX. PENAL CODE ANN. § 19.02(b)(1) (Vernon 2003).

## TERMINATION OF PARENTAL RIGHTS

In her first issue, Appellant complains that termination of her parental rights under section 161.001(1)(T) violated her right against the imposition of ex post facto laws because her criminal conviction occurred in 2004 and subsection (T) was not enacted until 2005. Further, she argues that the trial court's application of subsection (T) denied her the use or benefit of defenses that existed under other, previously-enacted subsections of the involuntary termination statute.

### Standard Of Review

■ A parent's rights to "the companionship, care, custody, and management" of his or her children are constitutional interests "far more precious than any property right." *Santosky v. Kramer,* 455 U.S. 745, 758–59, 102 S.Ct. 1388, 1397, 71 L.Ed.2d 599 (1982); *In re M.S.,* 115 S.W.3d 534, 547 (Tex.2003). In a termination case, the State seeks not just to limit parental rights but to end them permanently—to divest the parent and child of all legal rights, privileges, duties, and powers normally existing between them, except for the child's right to inherit. TEX. FAM.CODE ANN. § 161.206(b); *Holick v. Smith,* 685 S.W.2d 18, 20 (Tex.1985). We strictly scrutinize termination proceedings and strictly construe involuntary termination statutes in favor of the parent. *Holick,* 685 S.W.2d at 20–21; *In re E.S.S.,* 131 S.W.3d 632, 636 (Tex.App.-Fort Worth 2004, no pet.).

■ In proceedings to terminate the parent-child relationship brought under section 161.001 of the family code, the petitioner must establish one ground listed under subdivision (1) of the statute and must also prove that termination is in the best interest of the child. TEX. FAM.CODE

---

**4.** The Texas court found that E.M.N. was unlawfully removed from Tarrant and Johnson counties in violation of its 2001 order.

**5.** Appellee testified that she also offered to take J.J., but that J.J. and Appellant refused that offer. Appellee promised to keep J.J. in E.M.N.'s life.

ANN. § 161.001; *In re J.L.*, 163 S.W.3d 79, 84 (Tex.2005). Both elements must be established; termination may not be based solely on the best interest of the child as determined by the trier of fact. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex.1987).

▬▬▬ Along with a best interest finding, a finding of only one ground alleged under section 161.001(1) is sufficient to support a judgment of termination. *In re B.K.D.*, 131 S.W.3d 10, 16 (Tex.App.-Fort Worth 2003, pet. denied). But termination can only be upheld on a ground that was both pleaded by the party seeking termination and found by the trier of fact. *Vasquez v. Tex. Dep't of Protective & Regulatory Servs.*, 190 S.W.3d 189, 194 (Tex.App.-Houston [1st Dist.] 2005, pet. denied). Because subsection (T) was the sole ground alleged under section 161.001(1), we must review whether the constitutional protections against ex post facto laws apply to this case.[6]

## Ex Post Facto Laws

▬▬▬ The term "ex post facto" has often been used to refer to any law passed after the commission of an act that retrospectively changes the consequences of the act.[7] *See Grimes v. State*, 807 S.W.2d 582, 583–84 (Tex.Crim.App.1991); *In re Shaw*, 966 S.W.2d 174, 179 n. 3 (Tex.App.-El Paso 1998, no pet.). The United States Constitution's ex post facto provision applies only to criminal proceedings; however, the Texas Constitution's provisions apply to criminal cases and to civil cases involving vested rights that are legally recognized or secured.[8] U.S. CONST. art. I, § 10; TEX. CONST. art. I, § 16; *Barshop v. Medina County Underground Water Conservation Dist.*, 925 S.W.2d 618, 633 (Tex.1996); *In re A.R.R.*, 61 S.W.3d 691, 696 (Tex.App.-Fort Worth 2001, pet. denied), *disapproved of on other grounds by In re A.V.*, 113 S.W.3d 355, 360 (Tex.2003), *and In re C.H.*, 89 S.W.3d 17, 26 (Tex.2002); *Shaw*,

6. To preserve a complaint for our review, a party must have presented to the trial court a timely request, objection, or motion that states the specific grounds for the desired ruling, if they are not apparent from the context of the request, objection, or motion. TEX. R.APP. P. 33.1(a). If a party fails to do this, error is not preserved, and the complaint is waived. *Bushell v. Dean*, 803 S.W.2d 711, 712 (Tex.1991) (op. on reh'g). It is undisputed that Appellant did not raise her ex post facto issue at trial.

However, error is not waived if it falls within the narrow category of "fundamental error," which requires no trial court predicate for appellate review. *In re B.L.D.*, 113 S.W.3d 340, 350 (Tex.2003), *cert. denied*, 541 U.S. 945, 124 S.Ct. 1674, 158 L.Ed.2d 371 (2004). Fundamental error exists "in those rare instances in which the record shows the court lacked jurisdiction or that the public interest is directly and adversely affected as that interest is declared in the statutes or the Constitution of Texas." *Wal–Mart Stores, Inc. v. Alexander*, 868 S.W.2d 322, 328 (Tex.1993) (quoting *Pirtle v. Gregory*, 629 S.W.2d 919, 920 (Tex.1982)). This is such an appeal be-

cause of the public's interest, as stated in article I, section 16 of the Texas Constitution, in avoiding the retroactive application of laws. *See* TEX. CONST. art. I, § 16. Therefore, although Appellant did not raise her ex post facto claim in the trial court, we may review it. *Cf. Ieppert v. State*, 908 S.W.2d 217, 220 (Tex.Crim.App.1995) (holding that no preservation is required to raise ex post facto complaint in criminal cases).

7. A true ex post facto law is a law that (1) punishes as a crime an act previously committed that was innocent when done, (2) changes the punishment and inflicts a greater punishment than the law attached to the criminal offense when committed, or (3) deprives a person charged with a crime of any defense available at the time the act was committed. *See Johnson v. State*, 930 S.W.2d 589, 591 (Tex.Crim.App.1996); *Grimes*, 807 S.W.2d at 587.

8. Article I, section 16 states that no bill of attainder, ex post facto law, retroactive law, or any law impairing the obligation of contracts, shall be made. TEX. CONST. art. I, § 16.

966 S.W.2d at 179. A statute that allows a court to take into consideration conduct occurring before the effective date of the statute possesses a retroactive effect. *See Barshop*, 925 S.W.2d at 633. However, when the law is procedural or remedial in nature, retroactive application does not violate article I, section 16. *Shaw*, 966 S.W.2d at 179; *Sims v. Adoption Alliance*, 922 S.W.2d 213, 216–17 (Tex.App.-San Antonio 1996, writ denied). And mere retroactivity alone is not sufficient to invalidate a statute. *Barshop*, 925 S.W.2d at 633. A valid exercise of the police power by the Legislature, to safeguard the public safety and welfare, can prevail over a finding that a law is unconstitutionally retroactive. *Id.* at 633–34.

**Vested Rights**

▓▓▓▓ Parental rights are vested rights. *See M.L.B. v. S.L.J.*, 519 U.S. 102, 116–17, 117 S.Ct. 555, 564, 136 L.Ed.2d 473

(1996); *Santosky*, 455 U.S. at 758–59, 102 S.Ct. at 1397; *M.S.*, 115 S.W.3d at 547–48; *In re R.A.T.*, 938 S.W.2d 783, 784 (Tex. App.-Eastland 1997, writ denied). When determining whether a law retroactively impairs a vested right, we must consider (1) whether it advances or retards the public interest, (2) whether its retroactive portion gives effect to or defeats the bona fide intentions or reasonable expectations of affected persons, and (3) whether it surprises people who have relied on contrary law for a long period of time. *Sw. Bell Tel. Co. v. Pub. Util. Comm'n of Tex.*, 615 S.W.2d 947, 956–57 (Tex.Civ.App.-Austin 1981, writ ref'd n.r.e.).[9]

We note that the Texas Supreme Court has already held the retroactive application of a different subsection of section 161.001(1) constitutional. *See A.V.*, 113 S.W.3d at 356–57. In *A.V.*, the court reviewed the constitutionality of the retroactive application of subsection (Q), which

---

**9.** *Southwestern Bell* relies heavily on *Texas Water Rights Commission v. Wright*, in which the Texas Supreme Court discussed the underlying rationales for upholding or striking retroactive statutes. *Sw. Bell*, 615 S.W.2d at 956–57; *see Tex. Water Rights Comm'n v. Wright*, 464 S.W.2d 642, 649 (Tex.1971) (addressing statute authorizing the cancellation of water permits after ten years of continuous nonuse). The *Wright* court recited various viewpoints before holding that the statute at issue was not invalid despite its retroactive effects:

> One has said that "the most important single inquiry to be made, from the standpoint of the individual and aside from the public interest, is whether the retroactive law gives effect to or defeats the bona fide intentions or reasonable expectations of the persons affected." ... Another has said that the common characteristic in the cases holding a statute invalid is the element of surprise, by which a person has changed his position or omitted to change it in reliance upon the law in force.... Still another has said, "Where a statute has become a likely basis for substantial reliance by peo-

ple who may have changed their positions to reap its benefits, the policy against retroactive change is strong."

464 S.W.2d at 649 (internal citations omitted).

The United States Supreme Court observed in *Landgraf v. USI Film Products* that a statute does not operate "retrospectively" merely because it is applied in a case arising from conduct antedating the statute's enactment or because it upsets expectations based in prior law. 511 U.S. 244, 269, 114 S.Ct. 1483, 1499, 128 L.Ed.2d 229 (1994) (holding that new statutory provisions enacted while case was pending on appeal did not apply to that case). Rather, the test is whether the new provision attaches new legal consequences to events completed before its enactment, based on a review of the nature and extent of the change in the law and the degree of connection between the operation of the new rule and a relevant past event. *See id.* at 270, 114 S.Ct. at 1499. The Court observed that while any test of retroactivity will leave room for disagreement in hard cases, "familiar considerations of fair notice, reasonable reliance, and settled expectations offer sound guidance." *Id.*, 114 S.Ct. at 1499.

provides that parental rights may be terminated if the parent knowingly engaged in criminal conduct that resulted in his conviction and "imprisonment and inability to care for the child for not less than two years from the date of filing the petition." *Id.* at 358 The parent argued that because subsection (Q) was enacted in 1997, his pre–1997 criminal conviction and imprisonment could not be used to satisfy it. *Id.* at 360. However, although the parent was incarcerated before subsection (Q)'s effective date, the court held that its application was constitutional and that it was a valid ground for terminating his parental rights. *Id.* at 357, 362.

In doing so, the court considered subsection (Q)'s purpose, which was to remedy the conditions of abused and neglected children and not to enhance the punishment of the parent, and stated that it constituted a valid exercise of police power by the Legislature to safeguard public safety and welfare. *Id.* at 361. Such an exercise is a "recognized exception to the unconstitutionality of retroactive laws." *Id.* It also reasoned that subsection (Q) did not disappoint any reasonable reliance the

parent could have placed on the law when he was convicted of the federal drug offenses.[10] *Id.* at 361–62.

■■■ Appellant attempts to distinguish her case from *A.V.*, pointing to the fact that *A.V.* involved action by the State, rather than a private action as brought here by Appellee, E.M.N.'s paternal grandmother. *See id.* at 357. Appellant argues that *A.V.* was initiated by the State to remove the children from a life-threatening situation in that they were being left alone without sufficient food in unhygienic conditions, and that, in contrast, her children were fine. *Id.* However, although concern about the children's status while the father was incarcerated may have motivated the State's initial involvement in *A.V.*, the termination occurred because the father's acts satisfied subsection (Q), as Appellant's act here satisfied subsection (T).[11] *Id.* at 362. We must consider whether the reasoning in *A.V.* applies to subsection (T) and the facts before us.

Subsection (T) of section 161.001(1), the "Donna Hoedt" Act,[12] was enacted in the

10. The court referred to the parent's convictions for dealing drugs, his attempted prison escape, the imposition of a one-hundred-and-forty month sentence, and stated that, under those circumstances, he "could not reasonably expect that the State would not act to provide a safe environment for his children while he was imprisoned," making reference to the collateral consequences doctrine discussed by the court of criminal appeals in *Scott v. State*, 55 S.W.3d 593 (Tex.Crim.App. 2001). *A.V.*, 113 S.W.3d at 361. The court of criminal appeals stated in *Scott* that "[t]he resolution of criminal charges will always carry the possibility of collateral consequences, and as long as those consequences are not statutorily restricted, disabilities and disqualifications which the defendant might not have anticipated may proceed from the prior cause." *Scott*, 55 S.W.3d at 597.

11. Although Appellant calls Appellee's termination suit a "litigation of convenience," rath-

er than of necessity, there is nothing in the record to indicate that anything about this case was convenient or unnecessary. Appellee testified that the jurisdictional battle took three years and cost between $60,000 and $70,000. Appellee testified that she wanted her granddaughter with family, and not in foster care, because she felt that E.M.N. was safer that way.

12. Donna Hoedt's husband murdered her in 1996. Tex. H.R. Res. 193, 79th Leg., R.S. (2005) (resolution paying tribute to the life of Donna Hoedt), http://www. leg-is.state.tx.us/tlodocs/791/bill-text/html/HR00193I.htm (last visited March 30, 2007). Her mother then fought a legal battle to terminate the husband's parental rights to the four children. *Id.* Dennis Bonnen, the act's sponsor, stated that he was pleased to sponsor HB 657, which added subsection (T) to section 161.001, and that "[i]t

memory of a woman whose husband was convicted of murdering her, and whose mother "undertook a lengthy and expensive court battle" to obtain custody of her four grandchildren when the murderer retained his parental rights over them. *See* Tex. H.R. Res. 193; *see also* Tex. Fam. Code Ann. § 161.001(1)(T).

Similar to subsection (Q), the reasoning behind subsection (T) is not to enhance the punishment of a parent who is convicted of a crime. *See* Tex. H.R. Res. 193. Instead, it is to remedy the conditions of the children, and their caregivers, in the aftermath of a parent's conviction for the murder of the other parent. *Id.; see* Tex. Fam.Code Ann. § 161.001(1)(T); *cf. A.V.,* 113 S.W.3d at 362 (stating that subsection (Q) aims to remedy the conditions of abused and neglected children, not to enhance the punishment of the parent). Likewise, subsection (T) could not disappoint any reasonable reliance Appellant could have placed on the law when she was convicted of murder, nor could the termination constitute a surprise, because under subsection (E), which allows for termination if a parent engages in conduct that endangers the child's physical or emotional well-being, murder of one parent by the other has long been considered a ground for termination. *See In re S.B.,* 207 S.W.3d 877, 885 (Tex.App.-Fort Worth 2006, no pet.) (affirming termination under subsection (E) when father murdered children's mother while the children were present); *see also Porter v. Texas Dept. of Protective & Regulatory Servs.,* 105 S.W.3d 52, 59 (Tex.App.-Corpus Christi 2003, no pet.) (affirming termination for endangerment under subsection (E) when, among other facts, two of the four children saw their father shoot and kill their moth-

er); *In re B.R.,* 950 S.W.2d 113, 121 (Tex. App.-El Paso 1997, no writ.) (citing, among other facts, evidence showing that the father murdered the child's mother as sufficient to establish endangerment under subsection (E)), *disapproved of on other grounds by C.H.,* 89 S.W.3d at 26, *and In re J.F.C.,* 96 S.W.3d 256, 267 n. 39 (Tex. 2002); *Smith v. Sims,* 801 S.W.2d 247, 250 (Tex.App.-Houston [14th Dist.] 1990, no writ) (stating that murder of the child's other parent and the resulting imprisonment are sufficient to terminate under subsection (E)); *In re S.K.S.,* 648 S.W.2d 402, 404 (Tex.App.-San Antonio 1983, no writ) (affirming termination on failure to support but noting that if the father's conviction had not been on appeal, "surely a final conviction for the murder of the mother of the child would constitute the conduct described in sub[section] (E)"). Appellant therefore could not have reasonably assumed that her parental rights could not be terminated if she murdered E.M.N.'s father. Subsection (T) merely facilitates what could otherwise be done under another ground, in a public acknowledgment of the hardships suffered by the family of the murdered parent. *See* Tex. H.R. Res. 193.

Appellant cites *Shaw* to support her ex post facto argument. In *Shaw,* one of the grounds for termination was the constructive abandonment provision in subsection (N), which requires that for termination, the State must have been the child's managing conservator for "not less than one year." 966 S.W.2d at 179. The court in *Shaw* held that the statute violated the ex post facto provision because, in calculating the one-year period required by subsection (N), the court had to include time prior to

---

was a shame that [the grandmother] was having to ask the man who murdered her daughter about her grandchildren's medical care." *See* Dennis Bonnen, *Donna Hoedt Act Be-*

*comes Law,* http://www.dennisbonnen.com/ 2005–07–28/Hoedt.HTM (last visited March 30, 2007). He called that "additional victimization" of the family. *Id.*

the 1995 date on which the statute became effective. *Id.* at 182. Here, the ex post facto characteristics in *Shaw,* which focused on the timing and duration of the abandonment, are not present. Appellant's *Shaw*-based argument, therefore, is inapposite.

Nor does subsection (T) now sanction Appellant for an action, murder, that was legal when she committed it. In *A.R.R.,* we held that the application of subsection (L), which addresses causing death or serious injury to a child, to terminate the father's parental rights did not constitute an ex post facto violation, even though he committed the sexual assault on his daughter in 1990 and subsection (L) was not enacted until 1997. *A.R.R.,* 61 S.W.3d at 696. We reasoned that since 1986 the family code has provided that one basis for termination of a parent's rights is if the parent has been adjudicated criminally responsible for the death of or serious injury to a child. *Id.; see* TEX. FAM.CODE ANN. § 15.02(L) (Vernon 1986) (current version at TEX. FAM.CODE. ANN. § 161.001(1)(L)). Any sort of crime against a child, including sexual assault, constituted "serious injury" to the child, so that the application of the new subsection (L) did not constitute a violation of the Texas Constitution's ex post facto provisions. *A.R.R.,* 61 S.W.3d at 696.

We hold that the Texas Supreme Court's reasoning in *A.V.* and our reasoning in *A.R.R.* apply to the facts before us. Despite her conviction and imprisonment before subsection (T)'s enactment, Appellant's rights were not violated by its retroactive application. *See A.V.,* 113 S.W.3d at 356–57. E.M.N. and Appellee, her grandmother, are part of the public whose interest subsection (T) advances. *See id.* at 361. Subsection (T)'s underlying purpose is not to add additional punishment to Appellant for murdering E.M.N.'s father, but to safeguard the public welfare and advance the public interest by facilitating termination when one parent murders the other—an act previously used to support terminations under subsection (E). *See id.* Therefore, Appellant cannot now claim surprise and damage to her settled expectations under these circumstances.[13] *See id.; see also S.B.,* 207 S.W.3d at 885.

**Benefits & Defenses**

Appellant additionally argues that by applying subsection (T), the trial court denied her the use or benefit of defenses that existed under previously-enacted sections of the involuntary termination statute, under which, she admits, the trial court "very well might have found that the burden of proof ha[d] been met." Because Appellant's rights were terminated under subsection (T), we will address only the defenses she discusses under subsections (D)

---

**13.** We observe that, rather than additional punishment, the termination here was a collateral consequence of Appellant's conviction, as referenced in *A.V. See A.V.,* 113 S.W.3d at 361. We also note that subsection (T) could be interpreted as a remedial statute. A remedial statute has been defined as "one which introduces a new regulation for the advancement of the public welfare or conducive to the public good, one enacted to afford a remedy, or one intended to correct defects, mistakes, and omissions in the laws of the State." *Sims,* 922 S.W.2d at 217. A remedial statute generally addresses remedies or procedures.

*Id.* As discussed above, subsection (T) advances public welfare and was enacted to facilitate parental rights termination under circumstances in which one parent murders the other—circumstances previously incorporated under subsection (E). *See S.B.,* 207 S.W.3d at 885. If not remedial in itself, subsection (T) is analogous to a remedial statute in that it now provides a specific ground and specific relief to the family of a murdered parent, rather than its previous incorporation under the "endangerment" umbrella. *See* Tex. H.R. Res. 193.

and (E), the termination grounds most similar to subsection (T).[14]

Appellant refers to subsections (D) and (E), the endangerment grounds,[15] for the propositions that a parent can defend against these by showing that she made adequate provisions for the child and that conviction and imprisonment alone are not enough for endangerment. However, she cites *Naquin* for the adequate provisions proposition, a no-evidence case that provides no support for her argument. *See Naquin v. Tex. Dept. of Human Servs.*, 722 S.W.2d 448, 450 (Tex.App.-El Paso 1986, no pet.) (holding that there was no evidence under subsections (B), (D), (E), or (F) to support termination). She cites our decision in *In re D.T.* for the proposition that conviction and imprisonment alone are not sufficient to prove endangerment. *See In re D.T.*, 34 S.W.3d 625, 633 (Tex.App.-Fort Worth 2000, pet. denied). However, in *D.T.*, we held that conviction and imprisonment *are* factors to consider in determining endangerment, in addition to the type of crime committed. *Id.* at 635–36, 638. We stated, in our factual sufficiency review, that we should look not only at incarceration as a factor but also at the expected length of the sentence and whether the underlying conduct is of a type, in and of itself, from which endangerment of the child may be inferred. *Id.* at 638. *D.T.* is clearly distinguishable from this case in that the mother in *D.T.* was convicted and incarcerated for writing bad checks, not for murdering the child's father. *Id.* at 639. The facts here are more similar to the facts in the cases we cited in *D.T.* for the proposition that the underlying conduct for which a parent was imprisoned merits review. *See id.* at 636.

Finally, Appellant cites our holding in *E.S.S.* for the proposition that a murder conviction alone is insufficient to support a

**14.** To bolster her defense argument, Appellant also addressed the "abandonment" subsections, (A), (B), and (C), which revolve around voluntarily leaving the child alone or in the possession of another not the parent, with or without expressing intent to return and without providing for adequate support for varying time periods. *See* Tex. Fam.Code Ann. § 161.001(1)(A)-(C). She recites, as a defense to these grounds, a showing by the parent that she made arrangements for adequate care and support of the child. *See Holick*, 685 S.W.2d at 21. Appellant argues that *if* her termination had been brought on one of these grounds, the fact that she had placed her daughters with her father and then with family friends, the New Mexico foster family, would have constituted a defense, and that Appellee's seeking termination under only subsection (T) deprived her of this defense or any others.

Appellant neglects to address her violation of the terms of the court's 2001 order that these arrangements constituted, and otherwise presents mere speculation as to this issue because termination was brought on a ground more similar to endangerment than abandonment. We respond similarly to her argument on subsection (F), the "failure to support" ground, for which she cites *Mayfield* for the proposition that inability to pay is a defense, but makes no contention that this ground or its defense apply to the particular facts under which her rights were terminated. *See Mayfield v. Smith*, 608 S.W.2d 767, 769–70 (Tex.Civ.App.-Tyler 1980, no writ.). Likewise, we dismiss her argument about a "potential" defense to subsection (Q), the "two-year incarceration" ground, in which she cites *Frederick* with regard to triable issues of fact on care. *See Brazoria County CPS v. Frederick*, 176 S.W.3d 277, 280 (Tex.App.-Houston [1st Dist.] 2004, no pet.) (remanding for consideration by jury after father received a directed verdict and CPS appealed).

**15.** To justify termination under subsection (D), the parent must have knowingly placed or knowingly allowed the child to remain in conditions or surroundings that endanger the physical or emotional well-being of the child. Tex. Fam.Code Ann. § 161.001(1)(D). To do so under subsection (E), the parent must have engaged in conduct or knowingly placed the child with persons who engaged in conduct that endangers the physical or emotional well-being of the child. *Id.* § 161.001(1)(E).

termination under subsection (E). *See E.S.S.*, 131 S.W.3d at 639. However, in *E.S.S.*, the murder victim was *not* the other parent. *Id.* at 634–35. The child's mother and stepfather petitioned to terminate the rights of the father, who was serving a life sentence for the murder of someone who was not the child's mother, in conjunction with the stepfather's request to adopt the child. *Id.* The appeal addressed the father's agreement to voluntarily relinquish his rights and his subsequent attempt to revoke that agreement. *Id.* at 635–36. It was under those circumstances that we held that there was insufficient evidence under subsection (E) to support the trial court's endangerment finding: when the evidence consisted of "a single statement regarding [the father's] prison sentence for murder," that is, the father's admission that he was serving a life sentence, and precedent indicated, as in *D.T.*, that mere imprisonment was not enough to constitute a course of endangering conduct. *Id.* at 639.

 What Appellant fails to acknowledge in her review of all of these subsections and defenses is that, by their very nature, termination cases are driven by their facts. What might constitute a "defense" in some circumstances will not necessarily carry over to other circumstances—there is a significant distinction in the effect on the child, for example, between a parent's conviction and incarceration for writing bad checks, and a parent's conviction and incarceration for murder of the child's other parent. *Compare S.B.*, 207 S.W.3d at 885, *with D.T.*, 34 S.W.3d at 639. Our review of applicable precedent indicates that the murder of one parent by another constitutes a ground for

termination, and Appellant has failed to demonstrate that termination, under subsection (E) or otherwise, for such conduct allows for any defenses that were unavailable to her under subsection (T). Therefore, termination of Appellant's parental rights under subsection (T) did not violate her rights against retroactive application of laws and did not deny her any defenses that might otherwise have been available under the older subsections applicable to these facts. We overrule Appellant's first issue.

### Sufficiency Of The Evidence

In her second issue, Appellant complains about the legal and factual sufficiency of the evidence to prove the best interest finding under section 161.001(2).[16] Tex. Fam.Code Ann. § 161.001(2).

### Legal & Factual Sufficiency Standard Of Review

 Termination of parental rights is a drastic remedy and is of such weight and gravity that due process requires the petitioner to justify termination by clear and convincing evidence. *Id.* §§ 161.001, 161.206(a); *J.F.C.*, 96 S.W.3d at 263. This intermediate standard falls between the preponderance standard of ordinary civil proceedings and the reasonable doubt standard of criminal proceedings. *In re G.M.*, 596 S.W.2d 846, 847 (Tex.1980); *In re K.W.*, 138 S.W.3d 420, 425 (Tex.App.-Fort Worth 2004, pet. denied). It is defined as the "measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam.Code Ann. § 101.007.

---

16. Appellant specifically complains that there was no evidence or insufficient evidence that the termination and separation of the two siblings was in E.M.N.'s best interest. However, in the interest of completeness, we will consider this complaint within a full review of the trial court's overall best interest finding.

The higher burden of proof in termination cases elevates the appellate standard of legal sufficiency review. *J.F.C.*, 96 S.W.3d at 265. The traditional no-evidence standard does not adequately protect the parent's constitutional interests. *Id.* In reviewing the evidence for legal sufficiency in parental termination cases, we must determine whether the evidence is such that a factfinder could reasonably form a firm belief or conviction that the grounds for termination were proven. *Id.* at 265–66. We must review all the evidence in the light most favorable to the finding and judgment. *Id.* at 266. This means that we must assume that the factfinder resolved any disputed facts in favor of its finding if a reasonable factfinder could have done so. *Id.* We must also disregard all evidence that a reasonable factfinder could have disbelieved. *Id.* We must consider, however, undisputed evidence even if it is contrary to the finding. *Id.* That is, we must consider evidence favorable to termination if a reasonable factfinder could, and disregard contrary evidence unless a reasonable factfinder could not. *City of Keller v. Wilson,* 168 S.W.3d 802, 827 (Tex.2005).

This higher burden of proof also elevates the appellate standard of factual sufficiency review. *C.H.,* 89 S.W.3d at 25. "[A] finding that must be based on clear and convincing evidence cannot be viewed on appeal the same as one that may be sustained on a mere preponderance." *Id.* at 25. In considering whether the evidence of termination rises to the level of being clear and convincing, we must determine whether the evidence is such that a factfinder could reasonably form a firm belief or conviction that the grounds for termination were proven. *Id.* Our inquiry here is whether, on the entire record, a factfinder could reasonably form a firm conviction or belief that the termination of the parent's parental rights would be in the best interest of the child. *Id.* at 28.

The distinction between legal and factual sufficiency lies in how we review the evidence. *J.F.C.,* 96 S.W.3d at 266. In a factual sufficiency review, in determining whether the evidence is such that a factfinder could reasonably form a firm belief or conviction that its finding was true, we must consider whether disputed evidence is such that a reasonable factfinder could not have resolved it in favor of the finding. *Id.* If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction in the truth of its finding, then the evidence is factually insufficient. *Id.*

Nonexclusive factors that the trier of fact in a termination case may use in determining the best interest of the child include: the desires of the child; the emotional and physical needs of the child now and in the future; the emotional and physical danger to the child now and in the future; the parental abilities of the individuals seeking custody; the programs available to assist these individuals to promote the best interest of the child; the plans for the child by these individuals or by the agency seeking custody; the stability of the home or proposed placement; the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and any excuse for the acts or omissions of the parent. *Holley v. Adams,* 544 S.W.2d 367, 371–72 (Tex.1976). These factors are not exhaustive; some listed factors may be inapplicable to some cases; other factors not on the list may also be considered when appropriate. *C.H.,* 89 S.W.3d at 27. Furthermore, undisputed evidence of just one factor may be sufficient in a particular case to support

a finding that termination is in the best interest of the children. *Id.* On the other hand, the presence of scant evidence relevant to each *Holley* factor will not support such a finding. *Id.*

■ Here, E.M.N.'s desires were made known by the discussion and entry into evidence of a note E.M.N. had written to her amicus attorney.[17] Martha, Appellee's niece and co-joint managing conservator of E.M.N., testified that neither she nor her husband Tony had influenced E.M.N. to write the note. Martha read the note, which was in E.M.N.'s handwriting, aloud:

(1) I[']m afraid of [Appellant].

(2) I want to be safe with my family.

(3) I'm happy to be with my family again.

(4) I[']m afraid of [Appellant] kidnaping me.

(5) I don[']t want to live with [Appellant].

Appellee testified about E.M.N.'s daily activities, which included going to school, gymnastics, and cheerleading, while living with Martha and Tony during the week. She testified that E.M.N. stayed with her on the weekends and is very happy. Appellee also testified about the expanded family network available to E.M.N. in the area and that if E.M.N. needed counseling, she would get counseling for her. Appellee also testified that she gives Appellant's letters to E.M.N. but that, "sometimes she reads them, sometimes she don't," and that E.M.N. does not write back to her mother, even though Appellee has told her that if she wanted to write to Appellant, Appellee would mail the letters for her. Martha gave similar testimony.

E.M.N.'s first grade teacher, April Becker, testified by deposition. Becker testified about E.M.N.'s first day at school and about how Martha had accompanied E.M.N. and reassured her. Becker testified,

I just remember very vividly Martha was there waiting for [E.M.N.] at the end of pretty much every day right outside the school so [E.M.N.] knew to look for her at the end of the day. And if it wasn't her, on occasion it was Tony, her uncle, or it was Brandon, her cousin.... [E.M.N.] was never left waiting, wondering.

She described E.M.N. as "a piece of sunshine," and that "she's the kind that smiles at you and you can't help but smile back and just be happy because she's so sweet and happy." Many photos of E.M.N. were admitted as exhibits. Becker also testified that Martha and Tony had provided everything E.M.N. needed for school and for participation in extracurricular activities, that E.M.N. appeared happy and well-cared-for, and that she was academically on-target for her age group. E.M.N.'s report card was admitted into evidence.

Tony testified that he and Martha had been married for twenty years and that they have a sixteen-year-old son, Brandon. Martha testified that she also had a twenty-two year-old son, David, whom she gave up for adoption when he was three days old and with whom she now has a good relationship. Martha testified that she had been sexually abused by her father when she was very young, that she had gone through a lot of counseling, and that Appellee had been a strength to her. Martha and Tony completed a thirty-hour

---

**17.** The amicus attorney also reported her findings to the trial court at the close of testimony, indicating that she questioned Appellant's stability and her ability to provide a stable environment for E.M.N., and that Appellant's history of being around abusive men, if continued once Appellant was released from prison, would be a danger to E.M.N. Her recommendation was to terminate Appellant's parental rights.

parenting course to certify them as foster and adoptive foster parents. They testified that if the trial court granted the request for termination, their intent was to adopt E.M.N. Martha, Tony, and Appellee testified that they had the financial and physical abilities to take care of E.M.N.

Appellant testified that her plans upon her release were to reunite with her daughters, to get a job, and to find a place to stay. She indicated that she would probably live with her father or with her "spiritual mentor." She listed the courses she had taken while incarcerated, including various rehabilitation classes, NA, and AA. When asked if she was "remorseful for [her] prior act," she replied, "Most definitely." She testified about using "crack cocaine" and acknowledged that New Mexico's CPS-equivalent had filed a motion to terminate her parental rights to J.J. She also testified about her history with abusive men, J.J.'s father and E.M.N.'s father, and that when E.M.N. was born, she had tried to stop using drugs and failed. When asked about the murder, she indicated that it did not occur to her that she was damaging her children. The trial court indicated that it would not allow her to testify about the facts surrounding her conviction because she had pled guilty. Certified copies of Appellant's and her mother's convictions for the murder of E.M.N.'s father were admitted into evidence.

With regard to Appellant's specific issue, that there was no evidence or insufficient evidence that the termination and separation of the two siblings was in E.M.N.'s best interest, there was no evidence in the record that Appellee, Martha, or Tony had any intention of separating the sisters. To the contrary, all three testified about E.M.N.'s visit with J.J., and Appellee and Tony indicated that they would keep E.M.N. in contact with her. Appellee testified that she had offered to take J.J., that they had a birthday party for J.J. during her visit, and that she had allowed J.J.'s foster family to park their travel trailer on her property when they were there with J.J. during the previous summer. Appellee conceded that if she had to take E.M.N. to visit J.J. in New Mexico, she would, but preferred that J.J. come to Texas, for "Christmas, summers, and stuff." She testified that E.M.N. and J.J. talk on the phone, and that she would be willing to obtain internet access so that J.J. and E.M.N. could write to each other.

Having reviewed this evidence in the light most favorable to the finding and judgment, we conclude that it was legally sufficient, such that the factfinder could reasonably have formed a firm belief or conviction that it was in E.M.N.'s best interest to terminate Appellant's parental rights. See J.F.C., 96 S.W.3d at 265–66. Upon review of the entire record, we conclude that the evidence was also factually sufficient to support the firm belief or conviction necessary to the trial court's best interest finding. See C.H., 89 S.W.3d at 25, 28. This case strongly resonates with the Texas Supreme Court's words in C.H., that "[j]ust as it is imperative for courts to recognize the constitutional underpinnings of the parent-child relationship, it is also essential that emotional and physical interests of the child not be sacrificed merely to preserve that right." Id. at 26. We overrule Appellant's second issue.

## CONCLUSION

Having overruled both of Appellant's issues, we affirm the trial court's judgment.