

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 2-08-064-CV

IN THE INTEREST OF R.L. AND A.L., CHILDREN

------------

FROM THE 323RD DISTRICT COURT OF TARRANT COUNTY

------------

## MEMORANDUM OPINION[1]

------------

In three issues, Appellant Christen L. appeals the termination of his parental rights to R.L. and A.L.[2]  We affirm.

### I. Factual and Procedural History

---

[1] *See* TEX. R. APP. P. 47.4.

[2] To protect the privacy of the parties involved in this appeal, we identify the children by initials only and the mother and grandparents by their first names and the first initial of their last names only.  *See* TEX. FAM. CODE ANN. § 109.002(d) (Vernon 2002).

R.L. was born in 1998 and A.L. was born in 2001. The girls' mother, Christy L., had the care, custody, and control of the children from birth, along with another female child, B.S., to whom she gave birth in 2003.[3] Appellant is not B.S.'s father—by some point in 2002 or 2003, Appellant had left the home, and his next interaction with the children did not occur until 2007. While the children lived with Christy L. in Corpus Christi, there were numerous referrals to Child Protective Services (CPS) for neglectful supervision and drug abuse, as well as sexual abuse of R.L. by third persons.

In July 2006, Christy L. voluntarily placed the children with her mother and stepfather, who subsequently moved with the children to Fort Worth. Allegations of drug use, drug sales, and excessive physical discipline of the children led CPS to remove the children from the maternal grandparents and to place them into foster care in November 2006. The State cited both Appellant and Christy L. by publication when it initially filed suit in November 2006 because the location of both parents was unknown. Both Appellant and Christy L. eventually appeared and executed waivers of service.

Neither Christy L. nor Appellant attended the termination trial, and their attorneys did not put on any witnesses. The trial court granted the State's

---

[3] Christy L. also has two older children who live in Oklahoma with her ex-mother-in-law. Appellant is not the father of these children.

2

petition to terminate Appellant's parental rights,[4] finding by clear and convincing evidence that Appellant knowingly placed or knowingly allowed the children to remain in conditions or surroundings that endangered their emotional or physical well-being; that Appellant engaged in conduct or knowingly placed the children with persons who engaged in conduct that endangered their physical or emotional well-being; that Appellant constructively abandoned the children; and that termination of Appellant's parental rights, if any, would be in the best interest of the children. *See* TEX. FAM. CODE ANN. §§ 161.001(1)(D), (E), (N) & (2) (Vernon Supp. 2007). It also found that Appellant did not respond by filing an admission of paternity or counterclaim for paternity or for voluntary paternity to be adjudicated before the final hearing.[5] *See id.* § 161.002(b)(1).

## II. Discussion

In his first two issues, Appellant contends that the evidence was legally and factually insufficient to support the trial court's findings of endangerment and constructive abandonment.[6] Along with a best interest finding, a finding

---

[4] Christy L.'s parental rights to R.L. and A.L. were terminated in the same proceeding, but she does not appeal.

[5] Appellant briefed this as his third issue. However, based on our holding, we need not address it.

[6] The State contends that Appellant's issues were not sufficiently preserved under section 263.405(i) because they were not sufficiently specific. We decline to consider this argument. *See In re D.W.*, 249 S.W.3d 625, 645

of only one ground alleged under section 161.001(1) is sufficient to support a judgment of termination.  *In re E.M.N.*, 221 S.W.3d 815, 821 (Tex. App.—Fort Worth 2007, no pet.).  Appellant does not challenge the trial court's best interest finding.

## A. Legal and Factual Sufficiency

### 1. Standard of Review

A parent's rights to "the companionship, care, custody, and management" of his children are constitutional interests "far more precious than any property right."  *Santosky v. Kramer*, 455 U.S. 745, 758–59, 102 S. Ct. 1388, 1397 (1982); *In re M.S.*, 115 S.W.3d 534, 547 (Tex. 2003).  "While parental rights are of constitutional magnitude, they are not absolute.  Just as it is imperative for courts to recognize the constitutional underpinnings of the parent-child relationship, it is also essential that emotional and physical interests of the child not be sacrificed merely to preserve that right."  *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002).  In a termination case, the State seeks not just to limit parental rights but to end them permanently—to divest the parent and child of all legal rights, privileges, duties, and powers normally existing between

_____

(Tex. App.—Fort Worth 2008, pet. denied) (en banc) ("Section 263.405(i) is void because it violates the Separation of Powers Clause of the [Texas] constitution.").

4

them, except for the child's right to inherit. TEX. FAM. CODE ANN. § 161.206(b); *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985). We strictly scrutinize termination proceedings and strictly construe involuntary termination statutes in favor of the parent. *Holick*, 685 S.W.2d at 20–21; *E.M.N.*, 221 S.W.3d at 820.

In proceedings to terminate the parent-child relationship brought under section 161.001 of the family code, the petitioner must establish one ground listed under subdivision (1) of the statute and must also prove that termination is in the best interest of the child. TEX. FAM. CODE ANN. § 161.001; *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005). Both elements must be established; termination may not be based solely on the best interest of the child as determined by the trier of fact. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987).

Termination of parental rights is a drastic remedy and is of such weight and gravity that due process requires the petitioner to justify termination by clear and convincing evidence. TEX. FAM. CODE ANN. §§ 161.001, 161.206(a); *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002). This intermediate standard falls between the preponderance standard of ordinary civil proceedings and the reasonable doubt standard of criminal proceedings. *In re G.M.*, 596 S.W.2d 846, 847 (Tex. 1980); *In re C.S.*, 208 S.W.3d 77, 83 (Tex. App.—Fort Worth

5

2006, pet. denied).  It is defined as the "measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established."  TEX. FAM. CODE ANN. § 101.007.

In reviewing the evidence for legal sufficiency in parental termination cases, we must determine whether the evidence is such that a fact-finder could reasonably form a firm belief or conviction that the grounds for termination were proven.  *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005).  We must review all the evidence in the light most favorable to the finding and judgment. *Id.*  This means that we must assume that the fact-finder resolved any disputed facts in favor of its finding if a reasonable fact-finder could have done so.  *Id.* We must also disregard all evidence that a reasonable fact-finder could have disbelieved.  *Id.*  We must consider, however, undisputed evidence even if it is contrary to the finding.  *Id.*  That is, we must consider evidence favorable to termination if a reasonable fact-finder could, and disregard contrary evidence unless a reasonable fact-finder could not.  *Id.*

We must therefore consider all of the evidence, not just that which favors the verdict.  *Id.*  But we cannot weigh witness credibility issues that depend on the appearance and demeanor of the witnesses, for that is the fact-finder's province.  *Id.* at 573, 574.  And even when credibility issues appear in the

6

appellate record, we must defer to the fact-finder's determinations as long as they are not unreasonable. *Id.* at 573.

In reviewing the evidence for factual sufficiency, we must give due deference to the fact-finder's findings and not supplant the judgment with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). We must determine whether, on the entire record, a fact-finder could reasonably form a firm conviction or belief that the parent violated subsections (D), (E), or (N) of section 161.001(1). *C.H.*, 89 S.W.3d at 28. If, in light of the entire record, the disputed evidence that a reasonable fact-finder could not have credited in favor of the finding is so significant that a fact-finder could not reasonably have formed a firm belief or conviction in the truth of its finding, then the evidence is factually insufficient. *H.R.M.*, 209 S.W.3d at 108.

### 2. Endangerment

In his first issue, Appellant challenges the legal and factual sufficiency of the evidence to support the trial court's findings under section 161.001(1)(D) and (E), contending that he was not involved in or ever informed about any of the CPS referrals in Corpus Christi, that he was not aware of the children's situation in the Fort Worth home, and that he was not notified of the children's removal. Appellant also claims that the State put on no evidence that he had any knowledge that the children might have been endangered by Christy L.'s

7

actions. He contends that there was no evidence presented at trial regarding his early years around the children, his relationship with Christy L., or his prior contact with the children, that no home study was ever performed on his home, and that no criminal history was introduced.

The court may order termination of the parent-child relationship if the court finds by clear and convincing evidence that the parent has:

> (D) knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child;

> (E) engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child;

TEX. FAM. CODE ANN. § 161.001(1)(D) & (E). Because the evidence pertaining to subsections (D) and (E) is interrelated, we may conduct a consolidated review. *In re M.C.T.*, 250 S.W.3d 161, 169 (Tex. App.—Fort Worth 2008, no pet.). For purposes of these subsections,

> "[E]ndanger" means more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment, [but] it is not necessary that the conduct be directed at the child or that the child actually suffers injury. Rather, "endanger" means to expose to loss or injury; to jeopardize.

*Boyd*, 727 S.W.2d at 533; *In re J.M.M.*, 80 S.W.3d 232, 241 (Tex. App.—Fort Worth 2002, pet. denied), *disapproved on other grounds*, *In re J.F.C.*, 96 S.W.3d 256 (Tex. 2002).

8

Subsections (D) and (E) both focus on endangerment, but they differ with regard to the source and proof of endangerment. *In re S.M.L.*, 171 S.W.3d 472, 477 (Tex. App.—Houston [14th Dist.] 2005, no pet.). Subsection (D) concerns the child's living environment, rather than the parent's conduct, though parental conduct is certainly relevant to the child's environment. *Id.*; *In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.); *In re D.T.*, 34 S.W.3d 625, 632 (Tex. App.—Fort Worth 2000, pet. denied). Although the parent need not have certain knowledge that an actual injury is occurring, the parent must at least be aware of the potential for danger to the child in such an environment and must have disregarded that risk. *In re C.L.C.*, 119 S.W.3d 382, 392 (Tex. App.—Tyler 2003, no pet.).

Under subsection (E), the relevant inquiry is whether evidence exists that the endangerment of the child's physical or emotional well-being was the direct result of the parent's conduct, including acts, omissions, and failures to act, and it must be based on more than a single act or omission; a voluntary, deliberate, and conscious course of conduct by the parent is required. *J.T.G.*, 121 S.W.3d at 125; *J.M.M.*, 80 S.W.3d at 241; *see also In re R.F.*, 115 S.W.3d 804, 810–11 (Tex. App.—Dallas 2003, no pet.) (holding, under subsection (E), that parent's failure to complete service plan, among other facts, supported termination of parental rights); *In re U.P.*, 105 S.W.3d 222,

9

236 (Tex. App.—Houston [14th Dist.] 2003, pet. denied) (holding that the creation of an "emotional vacuum" in the child's life by being absent for more than twelve months, even due to incarceration, was evidence of endangering the child's emotional well-being); *In re M.J.M.L.*, 31 S.W.3d 347, 351–52 (Tex. App.—San Antonio 2000, pet. denied) (holding that evidence that the father knew the pregnant mother was a drug abuser but still disappeared for five months at the end of her pregnancy and failed to make arrangements for the care of his soon-to-be-born child during the time he was gone, choosing instead to leave the child in the care of a drug-addicted mother, was evidence of endangerment).

Placement with an abusive parent or relative is endangerment under either subsection (D) or (E).  *See In re J.M.C.A.*, 31 S.W.3d 692, 698 (Tex. App.—Houston [1st Dist.] 2000, no pet.) (terminating parental rights of mother who allowed children to remain with abusive father).

**3. Analysis**

**a. Testimony about Appellant**

In the affidavit supporting publication of the citation for Appellant, Lisa G., the children's maternal grandmother, reportedly told CPS that she "ha[dn't] heard from [the father] in 100 years." However, after the children had been in foster care for several months, the children's paternal grandparents discovered

10

this and notified Appellant. Between July and September 2007, Appellant traveled from Louisiana to visit the children.

Nina Longley, the CASA volunteer who was assigned to R.L. and A.L.'s case, testified that R.L. recognized Appellant on his first visit, but that A.L. did not, and that Appellant told her that he had not seen the girls in four years. R.L. and A.L.'s foster mother testified that R.L. remembered Appellant, but that A.L. remembered someone else as her father. Longley testified that Appellant's visits began in July 2007 and stopped in October 2007, when "he was arrested and went to jail," and that after he got out in December 2007, he did not resume his visits.

Whitney Lagadinos, the children's CPS caseworker, testified that CPS developed a service plan for Appellant and located a service provider for him in Louisiana, but that he failed to complete anything in the plan besides one drug test, which was clean, and his visits with the children. She testified that Appellant missed his visit with the children in October 2007 because he was arrested for domestic abuse and false imprisonment of his live-in girlfriend. She testified that Appellant did not try to make any contact with CPS or to continue visits with the children after October 2007, although she had been willing to set up services for him when he got out of jail, her contact information had not changed, and Appellant knew how to get in touch with CPS. She also testified

11

that, after she got a copy of the police report, she did not think that he would be a proper placement for the children.[7] When questioned about domestic violence in her psychological evaluation, Christy L. indicated that Appellant was physically abusive and that he had received a probationary sentence as a result of his assaultive behavior.

Lagadinos described the children's reaction to the fact that Appellant and other relatives were no longer being considered for placement as,

> They have been upset, but it seems as though they're used to being let down, and they have stated that their [foster] mom, which . . . they call Mom, that she is the only one that has been consistent, the only one that loves and cares about them. . . . [With regard to Appellant no longer being considered,] [R.L.] was angry about it. She was—She seemed angry with her father. . . . They appeared angry [and hurt]. . . . [T]hey asked me if they could just stay with Mom. And when I told them that was going to be our next option, they were happy about it.

Longley testified about the children's reaction as follows:

> Q.     What reaction did you observe when all of a sudden a plan would change in terms of going to their mother or going to their father or to relatives? How did the children respond to that?

> A.     They adjusted much better than I would have. . . . You know, they were—they probably expressed more disappointment in not being able to go to Florida [to live with a great-aunt].

---

[7] The police report was not admitted into evidence at trial.

The children's foster mother testified, with regard to the changing plans for the children,

Q. Was— Were these children aware or did they talk about their thinking that there was a plan that they were going to go back and live with their mom?

A. Yes. Their mom was telling them that she was getting everything together, she was complying with the classes and stuff, and this is when they went on visits.

Q. Okay. Did they seem excited about that plan?

A. Yes.

Q. And then sometime in the summer months, did they realize their mom was not coming to visits any more?

A. Yes.

Q. Okay. And did they have a reaction to that?

A. [R.L.] just said, my momma don't care about us. And that's what every— all the people that's come in to take them, [R.L.] just says nobody cares.

Q. And then when [Appellant], the alleged father, came in and starting having visits, did the girls talk at all with you about a plan of going to live with him?

A. They were excited. They don't really understand or— or know what happened to their dad.

Q. Have they had any reaction to his absence in their life?

A. No, not really.

13

Q.   And then there has been a relative in Florida that was a proposed plan for a period of time. Were the girls aware that they may go live with an aunt in Florida?

A.   They [were].

Q.   And how did they feel about that?

A.   They were excited, but [A.L.] was more excited because the auntie pampered them with things they were going to have, fish aquariums, they were going to have a room to themselves. And when it didn't happen, [R.L.] was like, ["]she lied.["]

**b. Testimony about Christy L.**

The evidence at trial, including Christy L.'s 2007 psychological evaluation, showed that Christy L. had an "extensive history of irresponsibility, instability, and drug use," and that she started using drugs before either child was born and continued to do so while the children lived with her. Christy L.'s drug use included marijuana, crack cocaine, and methamphetamine.[8] In her psychological evaluation, she admitted that she had used marijuana for approximately ten years, with her last usage in October 2006, and that she had used it daily for five years.

---

[8] Christy L. did not test positive for drugs when she gave birth to B.S. on October 10, 2003, but she did test positive throughout her pregnancy for methamphetamine: on April 22, 2003; June 11, 2003; July 15, 2003; and October 6, 2003. CPS investigated an allegation of neglectful supervision of R.L., A.L., and B.S. by Christy L. on October 20, 2003; drug paraphernalia was located in her home and CPS ruled "reason to believe" on this referral.

Christy L.'s psychological evaluation revealed that she had been charged with attempted aggravated assault in 1999. Michelle Sparks, who was a CPS investigator in 2006, testified that when she interviewed the children in July 2006, R.L. and A.L. told her that Christy L. would beat them with a broom. She also testified that R.L. "was able to describe how her mother would smoke crack with a small pipe as well as with a bigger pipe" and to draw a picture of those pipes, and to demonstrate how her mother was able to smoke "weed." Sparks testified about the various allegations CPS had investigated with regard to Christy L. and the children, starting in January 2003.

The children's foster mother testified that then-eight-year-old R.L. told her about sexual abuse by three different adult males,[9] including Lindsey S., the father of Christy L.'s daughter B.S.; that she watched Christy L. smoke cocaine with a pipe, that Christy L. used "weed and crack" a lot, and that she had smoked marijuana with Christy L.; and that her mother had hit her and A.L. with a broom handle and left bruises.

**c. Additional testimony**

---

[9] Sparks described a CPS investigation made on an allegation of sexual abuse on January 31, 2003, involving R.L. and Christy L.'s seventeen-year-old brother, who Christy L. brought in around November 2002 to take care of the children because she went to jail and then because she and Lindsey S. were working nights. The case was ruled "reason to believe."

15

Lagadinos testified that she believed that Appellant had constructively abandoned the children and that termination of Appellant's parental rights to the children was in their best interests, aside from the arrest, because "he had not been in contact with these girls throughout most of their lives." Longley testified that the children were doing well in foster care, that the foster mother had expressed interest in adopting the children, and that she believed that it was in their best interests that Appellant's and Christy L.'s parental rights be terminated. The children's foster mother testified that she was interested in adopting both children.

The children's attorney ad litem stated to the trial court that the fact that the parents "haven't taken on any initiative to work services and be in contact with CPS . . . is very problematic and has been painful and difficult for these children," and that he believed it would be in the children's best interests for both parents' rights to be terminated so that the children could be free for adoption.

### d. Conclusion

Although Appellant complains that he was not aware of the CPS reports, no explanation was provided at trial for his departure from the children's lives around 2002 or 2003, or his failure to return to them until 2007. The 1998–2003 time frame in which he was last involved with the children

16

overlapped with Christy L.'s description of her drug use history, which began before R.L. was born. The trial court could have reasonably concluded from the evidence at trial that Appellant abandoned the children to the care, custody, and control of a known drug user. *See J.M.C.A.*, 31 S.W.3d at 698; *M.J.M.L.*, 31 S.W.3d at 351–52. Appellant emotionally abandoned the children twice: once by failing to contact them for four years, before starting to visit them again in July 2007, and then again by failing to resume contact upon his release from jail in December 2007. *See U.P.*, 105 S.W.3d at 236. And he failed to complete his service plan, even though CPS made arrangements for him to be able to complete the services in Louisiana. *See R.F.*, 115 S.W.3d at 811.

Reviewing the evidence in the light most favorable to the finding and judgment, we determine that the trial court could have reasonably formed a firm belief or conviction with regard to the endangerment grounds under subsections (D) and (E). *See J.P.B.*, 180 S.W.3d at 573. Furthermore, on the entire record, we determine that the trial court could have reasonably formed the same firm conviction or belief. *See C.H.*, 89 S.W.3d at 28. Therefore, because the evidence at trial was legally and factually sufficient to support the termination of Appellant's parental rights under subsections (D) and (E), we overrule Appellant's first issue. We need not reach his second or third issues. *See E.M.N.*, 221 S.W.3d at 821; *see also* TEX. R. APP. P. 47.1.

17

### III. Conclusion

Because we overrule Appellant's first issue and because we need not address his second and third issues, we affirm the judgment of the trial court.

PER CURIAM

PANEL F:   MCCOY, LIVINGSTON, and DAUPHINOT, JJ.

DELIVERED: July 31, 2008