

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
### FORT WORTH

NO. 2-08-239-CV

IN THE INTEREST OF C.H.
AND M.H., THE CHILDREN
AND IN THE INTEREST OF
E.M.B., R.H.D.G., AND J.G.G.,
MINOR CHILDREN

------------

FROM THE 362ND DISTRICT COURT OF DENTON COUNTY

------------

## MEMORANDUM OPINION[1]

------------

After a trial, a jury found by clear and convincing evidence that Appellant

A.G. (Mother) knowingly placed or knowingly allowed her five children, E.M.B.,

R.H.D.G., J.G.G., C.H., and M.H., to remain in conditions or surroundings

which endangered their physical or emotional well-being; engaged in conduct

or knowingly placed her children with persons who engaged in conduct which

---

[1] See Tex. R. App. P. 47.4.

endangered the children's physical or emotional well-being; and failed to comply with the provisions of a court order that specifically established the actions necessary for the return of the children, who had been in the permanent or temporary managing conservatorship of the Texas Department of Family and Protective Services for not less than nine months as a result of the children's removal from Mother under chapter 262 for the abuse or neglect of the children.[2] The jury also found by clear and convincing evidence that termination of the parent-child relationship between Mother and the children was in the children's best interest.[3] The trial court made the same findings and terminated Mother's rights to the children.

The State contends that we should dismiss Mother's appeal as to the termination of her rights to the three older children, E.M.B., R.H.D.G., and J.G.G. Trial Court Cause Number 2006-40924-362, regarding E.M.B., R.H.D.G., and J.G.G., and Trial Court Cause Number 2007-40820-362, regarding C.H. and M.H., were consolidated for trial. We decline the State's invitation to revisit our acceptance of Mother's amended notice of appeal, our grant of the State's motion that the appellate record be supplemented, and our implicit denial of the State's alternate motion to dismiss Mother's appeal of the

---

[2]... *See* Tex. Fam. Code Ann. § 161.001(1)(D), (E), (O) (Vernon 2008).

[3]... *See id.* § 161.001(2).

termination of her parental rights to E.M.B., R.H.D.G., and J.G.G. because these cases were consolidated for trial, the jury delivered one verdict, and the trial court told Appellant in open court after the verdict was announced that she had "the right to appeal *this case.*"  [Emphasis added.]

In eight points, Mother contends that the evidence is legally and factually insufficient to support each finding.  Because we hold that the evidence is legally and factually sufficient to support the endangerment findings[4] and the best interest finding,[5] we affirm the trial court's judgments.

The jury heard the following evidence in these cases, cases where termination was sought after reunification failed.  The State's first witness was Mother.  Mother testified that CPS contacted her in August 2006 because someone had reported that she was using methamphetamine.  At the time, Mother and her three children, E.M.B., R.H.D.G., and J.G.G., were living with Mother's boyfriend, C.S.H.  After CPS initially contacted her in August 2006, Mother withdrew E.M.B. from school to prevent CPS from taking her without Mother's knowledge, left C.S.H.'s apartment, and moved into her grandmother's home.

---

[4] *... See id.* § 161.001(1)(D), (E).

[5] *... See id.* § 161.001(2).

Mother admitted at trial that she had in fact been smoking methamphetamine every other day or every day in August 2006. She at first refused to take a drug test because she knew it would be dirty. Mother and the three children all tested positive for methamphetamine. CPS removed the children on August 30, 2006.

Mother admitted at trial that she, C.S.H., and her brother had smoked methamphetamine in the home with the three children before the removal, that her mother and grandmother both knew she used, and that they both knew she used when the children were with her. She admitted that the children had seen her under the influence of methamphetamine. She said that they did not see her using but that they were in the home under her care when she was using. Mother testified that methamphetamine makes you stay up for days, that she did not think that she was a good mother when she was using methamphetamine, and that she was not able to meet her children's emotional or physical needs when she was using methamphetamine.

Mother admitted that the drugs in the children's systems put them in danger, that her home life in August 2006 was not good for them, and that she placed them in danger. She admitted that her drug use when her children were with her in the home endangered their physical or emotional well-being and that her children did not deserve to be in that environment. She admitted telling

4

CASA advocate Carolyn Kirk that "[t]he kids ha[d] seen things and been around things they shouldn't have, and [that she] hope[d] it wo[uld]n't affect them later in life."

At the time of the August 2006 removal, Mother's children knew that C.S.H. smoked marijuana; she was aware that he openly rolled cigarettes in their presence. She testified at trial that she did not think that was a good environment for them but that she allowed it to go on because she was not "clearheaded at the time." After she admitted to CPS that C.S.H. used marijuana, she denied to CPS that he was her boyfriend because the CPS worker told her that she could not be with him based on his drug use. She testified that she stayed with him against CPS's advice because she cared for him and loved him.

Mother also testified that C.S.H. sold marijuana and that after the removal, she turned a blind eye to whether he was still dealing because she was clean and had nowhere else to go. Yet she admitted that she actually had received assisted housing in Gainesville for herself and her children (should they be returned to her) but had lost it because C.S.H. lived with her in violation of the housing agreement. In October 2006, he went to jail, and Mother and D.G., R.H.D.G.'s father, began seeing each other again. Mother did not recall if she spent a weekend with D.G. in October 2006.

5

Mother admitted that after the removal of her three children, she overdosed on a mixture of alcohol and "quad bars" (xanax) that she had obtained from C.S.H. and that her friends and family were concerned that she had tried to kill herself. She told psychologist Nichelle Wiggins that she had not tried to kill herself but had cut herself with a knife. After her overdose, she started services with MHMR, but she admitted that she missed several appointments and in fact had not been for a couple of months before trial, even though she claimed that treatment was important to her and that her family was supportive.

Mother's testimony was unclear regarding when she started using methamphetamine. At one point, she stated that she began using methamphetamine before her oldest child, E.M.B., was born. Later, she indicated that it might have been after E.M.B.'s birth; finally, she testified that it was after the birth of her second child, R.H.D.G., which would indicate at least more than three years' use before the August 2006 investigation and removal.

Mother also testified that she started using methamphetamine with D.G. They married in 1999 when she was seventeen years old, a few days before he went to prison after being convicted of aggravated assault with a deadly weapon.

6

In 2000, she became pregnant with E.M.B., whose father was M.B. Mother, M.B., and E.M.B. lived with Mother's grandparents. Mother's niece testified that Mother used methamphetamine while she was pregnant with E.M.B. and after E.M.B. was born.

By the time D.G. was released from prison in 2002, Mother testified, she and M.B. had broken up due to his alcoholism, but Mother would visit him "every once in a while." Mother did not tell Wiggins that M.B. was an alcoholic; rather, Mother told her that he was a good father and involved in their daughter's life.

After D.G. was released from prison, Mother and D.G. lived together at his parents' house, along with E.M.B. Mother then got pregnant with R.H.D.G. D.G. was present for R.H.D.G.'s birth in 2003, but D.G. was not involved with their son afterward for about a year, and Mother and her children lived with her grandmother. When R.H.D.G. was about a year old, Mother allowed D.G. to take their son for short periods of possession. She testified that she found out that D.G. was using and dealing drugs in 2005. Mother used methamphetamine with him, and she admitted at trial that she used drugs at the beginning of her pregnancy with J.G.G. But she stated that she did not discover that she was pregnant until she was five months along; J.G.G. was born in January 2006. According to Mother, D.G. had forced her to sleep with

7

another drug dealer to whom D.G. owed money; that man was J.G.G.'s biological father.

Mother admitted that she had allowed D.G. to take R.H.D.G. for a visit on one occasion in the spring of 2006 even though she had had concerns because of D.G.'s drug dealing and drug use. She also admitted that letting him take R.H.D.G. was not a good idea and that D.G. brought R.H.D.G. home at 5:00 a.m. once or twice. Mother also testified that she may have told Wiggins that she "never denied [D.G.] any access to [R.H.D.G.] because, after all, [D.G.] was [R.H.D.G.'s] father." Michele Greer, Mother's therapist for almost a year during the case, testified that Mother had reported that D.G. had kept R.H.D.G. from Mother for several weeks at one point.

Initially, Mother admitted that she used methamphetamine until August 2007, a year after her older three children were removed, but she stated that she was only using maybe twice a month at that point and was not using with C.S.H. or her family members. Later she testified that she last smoked methamphetamine in February 2007 and that she did so with C.S.H. She also testified that she last used drugs at the end of January or beginning of February 2007. She conceded that she was using while she was in drug treatment during the first six months after the removal. Her last positive drug test occurred in March 2007. Mother's niece, who testified that she had last used

methamphetamine with Mother five or six years before trial and had not used drugs for five or six years, testified that she did not know whether Mother still used drugs but that she did know that Mother still hung out with the same people with whom she had used drugs in the past.

Mother could not remember when she told the CPS worker that she was pregnant with twins, fathered by C.S.H., but she delivered the twins early in June 2007, while she still lived in the Gainesville home. Mother lied to the hospital about the location of her older three children, stating that they were staying with her grandmother. Mother admitted at trial that the hospital expressed concerns about C.S.H. and her attentiveness to the twins. Although Mother admitted drug use during the pregnancy with the twins and that the drug use put them in danger, she testified that she did not believe that her drug use during the pregnancy endangered their health. The twins were not tested for the presence of drugs at their birth. After CPS found out that the twins had been born, CPS removed the twins and placed them with their paternal grandfather and his wife.

After admitting that she had used methamphetamine during her first stint of outpatient drug treatment, Mother attended outpatient drug treatment again beginning in September 2007, after the twins' birth. The plan was for her to attend individual counseling sessions once a month and outpatient treatment

twice a week for ninety days. She testified that she got a certificate for completion but did not know if she had completed the required number of sessions. The progress notes in State's Exhibit 9 indicate that she "was seen regularly for individual counseling and attended group" counseling [twice a] week, "successfully completed the outpatient treatment program," "met [the] goals and objectives on her treatment plan," and received a certificate for successfully completing the program.

Mother also testified that she went to NA and AA at first but eventually quit because she did not find it helpful. She was not attending at the time of trial, and it had "been a while" since she had last attended; she had "been to a few here and there" despite the trial court's order that she attend weekly. She admitted that despite her testimony at a prior hearing that she was working the steps of AA, she might not have been in fact working the steps. She could not explain step one, three, or four at trial. She testified at trial that she was not an alcoholic, that she was a recovering addict, and that she did not have a current drug problem.

Although Mother testified that her family members did not give her drugs when she initially began using, she admitted that they did provide her with drugs later. After a family group conference in December 2006, she told the CPS caseworker that her mother "use[d] all her money up at the beginning of

10

the month on drugs and then [had] to rely on [her own mother, the children's great-grandmother] for care," that her mother and stepfather used on a regular basis, and that they were "skitzing on drugs" during the family group conference.

In October 2006, Mother began seeing Greer. Mother attended all the October and November sessions, missed one in December and one in January, attended only one in February, and attended three in March 2007 before Greer stopped the services because Mother's obstetrician had ordered her to be on bed rest. According to Greer, she saw Mother again for one visit in July 2007 and last saw Mother in August 2007, when she terminated the sessions because of the missed appointments and lack of progress.

Greer testified that Mother saw CPS as being unfair and did not feel responsible for the initial removal. Even though Mother would sometimes admit that her drug use caused the removal, she did not seem to understand the effect her drug use had on the children or accept her role in the removal. Greer testified that such acceptance would indicate that a person could make changes to avoid repeating the same mistakes in the future. Greer also testified that Mother's story about her substance abuse changed over the period of counseling. Greer opined that in addition to her drug use, Mother had other issues, including bipolar disorder, for which Greer believed Mother did not seek

11

appropriate treatment; long-standing maladaptive personality traits, like dependency; and some impulsivity.

Greer also testified that Mother, whose IQ was 76 (in the borderline range—below 70 indicates mild mental retardation), made only minimal progress toward the therapeutic goals of increasing her adaptive coping skills, becoming self-motivated, and decreasing her dependency on others. As evidence of her conclusion, Greer pointed to Mother's choice to spend four days with D.G. and do drugs with him in October 2006, her choice to visit the children the next day after she used drugs, and her choice not to follow the doctor's instructions regarding bed rest when she was pregnant with the twins, wanting to please others instead of putting the twins' needs first. Greer also testified that Mother had difficulty setting boundaries in her relationships, pointing to her relationships with the children's fathers. Greer concluded that Mother never showed an ability to distance herself from negative influences and people but seemed to gravitate toward them. Greer testified that when she terminated counseling in August 2007, Mother was not able to function independently, was not taking responsibility for her actions, and was not making good choices in relationships. But Greer also testified that Mother is a very caring person, that it was clear that Mother loved her children, and that she cared about other people, just too much.

12

About three months after the twins' birth, on September 14, 2007, Mother began seeing Jim Chambers for counseling. At the beginning, she attended weekly. But she only went twice in November, cancelling one appointment and "no-showing" another, and did not go at all in December. Nevertheless, she testified at a hearing in December that she was attending counseling regularly. After the children were returned in December 2007 and January 2008, she attended one counseling session in January.

Against the wishes of CPS and CASA, the older three children were returned to the home in a monitored return on December 22, 2007, and the twins were returned to the home in a monitored return on January 10, 2008. Mother worked nights, so C.S.H., who had also participated in some services, cared for the children in her absence. Mother had testified in December before the return that if C.S.H. did anything wrong, he would be out and that she would put her children before him. One week after the older children were sent home, he was arrested for evading arrest. Mother testified that she did not ask for details because she was not involved in his actions and did not care to know. She admitted at trial that it would have been a good idea to know what C.S.H. was doing even outside her presence and that of her children. His arrest did not lead Mother to question whether the relationship should continue.

13

Mother testified that C.S.H.'s "drinking a lot" after the children's return caused her concern but that she did nothing to stop it; instead she started staying home with them. She also admitted that she drank alcohol despite the warnings about it that she had received in drug treatment.

Mother admitted at the termination trial that she had lied at a November 2, 2007 hearing scheduled by her attorney to get the children returned when she testified that she had no knowledge that C.S.H. had been dealing drugs since they had been together. She stated that she did not know why she had lied and admitted that she might have thought she needed to lie to get the children back in her possession.

K.H., C.S.H.'s stepmother, testified that she had been concerned about the planned return of the twins to Mother and C.S.H. because they were not going to the classes they were supposed to attend and C.S.H. was still doing drugs and drinking alcohol. K.H. also testified that after the twins were born but before their removal, Mother had told her that C.S.H. was selling drugs.

After the children came home, E.M.B. made an outcry against C.S.H. Mother testified that her mother, who had spent the night on Tuesday, January 29, 2008, told her two days before the children were again removed on February 1 about the outcry. Mother also testified that her mother was not using drugs at that particular time and that she thought that having her around

14

the children was a good choice because her mother was not using drugs that day. Early on Wednesday, January 30, 2008, Mother drove C.S.H. to the jail, where he turned himself in on a different matter. After Mother took E.M.B. to school, the grandmother told her that E.M.B. had reported that C.S.H. was touching her when Mother was at work. Mother testified that she believed her mother. When Mother talked to E.M.B. about it after school, Mother testified, E.M.B. denied it. On Wednesday night, Mother went to pick C.S.H. up at the jail. She took the twins and E.M.B. In the car, Mother asked C.S.H. about the allegations in front of E.M.B. Mother testified that E.M.B. had asked her to talk to C.S.H. about it in front of E.M.B. because E.M.B. was afraid that she would get in trouble with C.S.H.

On Thursday, January 31, 2008, C.S.H. went to work, and Mother and all five children stayed at the house. Mother called K.H. to come over and speak to E.M.B. that afternoon. After speaking to E.M.B., K.H. told Mother that "something had to have happened; [E.M.B.'s] not lying about it," and K.H. made it clear to Mother that she had to make a decision. K.H. testified that she told Mother that she had to either get the children out of the house or get C.S.H. out of the house. Mother testified that she had known that she had to get rid of C.S.H. She initially testified that he stayed somewhere else that night, but after being confronted with her testimony from the February 21,

15

2008 hearing that he had stayed home Thursday night, she testified that he had spent Thursday night at home.

On Friday, February 1, 2008, Mother stayed at home with the children. That afternoon, she dropped R.H.D.G. and J.G.G. off at C.S.H.'s place of employment before taking E.M.B. to karate class. After class, Mother stopped by her grandmother's home but did not tell her about E.M.B.'s outcry. Mother admitted that she had known that if she told her grandmother about E.M.B.'s outcry, then her grandmother would tell her to end her relationship with C.S.H. Mother then picked up C.S.H., R.H.D.G., and J.G.G.; E.M.B. was also in the car. When they got home, the police were waiting.

Mother testified that E.M.B. did not tell her that C.S.H. was in fact touching her inappropriately until Friday night at the CPS office, after the children were removed again. Mother also testified that E.M.B. told her that she had at first denied the contact because she did not want CPS to take her away from Mother. Mother testified that it would be important to a child who has been molested to know that her parent would believe her and protect her.

Mother's niece testified that Mother told her on Thursday, the day before the second removal, that E.M.B. had told her on Wednesday that C.S.H. had been touching her while Mother was at work. K.H. also testified that Mother told her on Thursday that she thought that C.S.H. had touched E.M.B.

16

Mother's niece testified that when she asked Mother what she was going to do, Mother said that E.M.B. lied a lot, that Mother did not know whether E.M.B. was telling the truth, and that Mother did not think that C.S.H. would do something like that. A week after the second removal, the niece testified, Mother and C.S.H. were still together, and Mother told her that she was going to stay with him because she did not believe that he had molested E.M.B.

E.M.B.'s therapist testified that E.M.B. told her that C.S.H. had touched her privates, that it happened a lot and when Mother was at work, that she had told Mother about it the first time it happened and had told Mother more than once, that Mother kept asking her if it really happened, and that E.M.B. believed that Mother believed C.S.H. instead of her.

On the Monday following the second removal, Mother called CPS worker Amber O'Guinn to tell her that she had kicked C.S.H. out of the house. Mother told Amber that she had not known that C.S.H. was abusing E.M.B. At her visit with the children the day after her telephone call with Amber, despite being told not to mention or bring up C.S.H., Mother told E.M.B. that she had kicked C.S.H. out of the house. Mother testified that E.M.B. had asked her if she had kicked him out. The trial court cancelled the visits at that point, and Mother had no more visits before trial.

After the second removal, Mother called the older three children's foster mother "to check on them" and also told the foster mother that she had not known about the abuse.

At the time of the second removal, Mother asked that the twins be placed with foster parents instead of C.S.H.'s father and stepmother, with whom the twins had stayed previously. CPS believed that one of the grandparents had forewarned C.S.H. and Mother about the second removal. The twins were placed with foster parents.

On February 23, 2008, according to Mother, C.S.H. kicked in the house door, came in, started hitting her, and trashed the house. She went to the neighbors and called 911. The officer who spoke to Mother at the scene testified that she told him that C.S.H. had slapped her in the face, but the officer saw no mark. C.S.H. denied the assault, and he told the officer that he still lived there. The officer saw men's clothes in the dresser. The police did not arrest C.S.H.

Mother attended parenting classes. She completed one set by December 2006. She completed another set sometime after the twins were born. She took only three weekly classes in the six weeks before trial in May 2008, despite her testimony in a prior hearing that she was going to begin classes in February 2008. Her last class was on April 9, 2008.

18

Mother missed one or two visits with her children because she forgot to call in or because she overslept; otherwise, she attended all her scheduled visits unless CPS cancelled them. She had to leave a visit after she hit R.H.D.G.; she said they were just playing. She denied telling the children on two visits that if they did not put on their jackets, she would not come back the following week and agreed that such threats would not be appropriate.

After rescheduling a couple of times, Mother completed a psychological evaluation with Wiggins in December 2006. The psychological evaluation showed that she had a bipolar disorder and limited insight. Wiggins testified that the chances of people with limited insight engaging in maladaptive behavior and making poor decisions are very high. Wiggins also testified that Mother had dependency issues and a tendency to rationalize poor decisions and to externalize, or blame others, for her issues.

After the twins were born, Mother found a job at Family Dollar. After about three days, she was terminated because of a past theft conviction. Mother soon found a job with Jack-in-the-Box, which she still had almost nine months later at the time of trial, despite quitting once and either quitting or getting fired another time. This was her longest period of employment ever.

At the time of trial, Mother was living in Gainesville in the same home she had lived in since at least December 2007. She testified that it was in the

19

children's best interest to be returned to her because she's their mother, she loves them, and she's "been there" for them.

Mother testified that at the time of the first removal, she had told the CPS worker that it would be better for her children to be placed in foster care than with a family member because her grandmother, whom she would have preferred to care for the children, could not take care of herself and her grandfather was sick. One of her aunts already had a CPS history, and the other aunt was not chosen for a placement. Mother testified that her mother and stepfather, who were present at trial, were current users of methamphetamine.

E.M.B.'s therapist testified that after the second removal, E.M.B. was terrified of the dark, had nightmares, and had wet herself. The therapist also recommended that weekly therapy continue and testified that E.M.B. will continue to need to work on and to be able to talk about the sexual abuse, that she needs a parent who will follow through with her therapy, that she needs a nurturing and supportive home environment, and that she needs to be believed about the sexual abuse. She stated that E.M.B.'s caregiver will need to be sensitive to her needs as she grows because dealing with the sexual abuse may be long term. The therapist expressed concerns that if E.M.B. were returned to Mother, Mother would not protect her from sexual abuse or be sensitive to

20

her needs regarding the sexual abuse. The therapist also stated that the more times E.M.B. has to change homes, the harder that would be, because moving would shake her sense of stability and her ability to trust. The therapist testified that E.M.B.'s anxiety had decreased, that she was getting more settled with her foster parents, feeling very close to them and safe with them, and that she trusted her therapist. The therapist opined that the foster parents' home was a good environment for E.M.B. and that E.M.B. has bonded with them. But E.M.B. loves Mother as well and is conflicted because she wants to be in both places.

The therapist also testified that R.H.D.G. had started having some issues with acting out sexually.

Stephanie, the foster mother of E.M.B., R.H.D.G., and J.G.G., testified that when the children were originally placed in her home in August 2006, they seemed very unfamiliar with routine and structure. E.M.B., who was in kindergarten, had not mastered her colors and did not know her letters or numbers or how to write her name or even her first initial. She then developed self-esteem issues, which led to behavioral problems at school, like scribbling on another student's paper, hitting and pushing on the playground, and having difficulty following instructions. The foster parents worked with her, enrolled

her in a social skills class at her school, and took her to church twice a week to give her more time to be with children her age.

When R.H.D.G. first moved into the foster home, he had a negative view of police officers and talked about smoking pot, doing drugs, and drinking beer, both generally and as something he was going to do. Stephanie echoed the therapist's testimony about R.H.D.G.'s sexual acting out in pre-K.

Stephanie testified that the children's behaviors improved over time, that they thrived on routine, that they became much more secure and confident, and that they went from getting used to sleeping in their own beds to being able to sleep with the door shut.

When the children were returned to Stephanie after the second removal, the biggest thing she noticed was fear. R.H.D.G. was apprehensive about the bedroom door being shut at night and was defensive and aggressive. Stephanie testified that it took about two weeks for him to be "okay again." She also testified, however, that more sexual acting out occurred after his return. E.M.B. had gone from being able to sleep with a dim nightlight to needing a lamp that illuminated the whole room. She also had some daytime urination accidents.

When E.M.B. was returned to Stephanie's home, she told her foster mother, "We're here because of [C.S.H.], but I can't talk about it. My mom

22

and my nana said I can't talk about it because it's all taken care of." After her CPS interview, E.M.B. told the foster parents and R.H.D.G. that "[C.S.H.] had touched her private parts and that that's why . . . she told the truth." She also told them that it happened and that she reported it to Mother before the twins were returned home.

J.G.G., who had been a very outgoing, happy toddler who loved water and taking baths, was withdrawn and quiet and "really just fell apart and did not want to get in the bathtub" when Stephanie tried to give him a bath after the second removal. After a few days, though, he started singing again.

Stephanie testified that the children had been with her and her husband a total of eighteen months, that she and her husband love the children, that the children appear to love her and her husband and tell them so everyday, and that they're all very close. They have bonded and have a very strong relationship. But she also admitted that E.M.B. has told her before that she wants to go back to Mother.

Stephanie also testified that the children know the foster parents' extended family and friends. She stated that she and her husband would like to adopt the children if they become available and that she would be committed to keeping the children in contact with the twins, who are with other foster

23

parents, including having overnight visits. She also testified that the children had visited with the twins three times since the second removal.

Stephanie stated that the children love Mother, that she believed that Mother showed them love and affection, that she would be willing for the children to have a relationship with Mother if possible, and that she had helped the older two children write letters to Mother expressing that they loved and missed her.

Greta testified that she is the foster mother of the twins, that the first thing she noticed when they arrived on February 2, 2008, between 12:00 and 1:00 a.m. was their wheezing, that she later learned that they had bronchitis as a result of having RSV in January, and that even though they were seven and a half months old when they arrived, C.H. could sit up for only a short time, M.H. could not sit up at all, and neither baby was rolling over. The babies also had solid food issues. Greta worked with them on their milestones and also set up Early Childhood Intervention (ECI) visits. At the time of trial, ECI was no longer needed. The twins, who slept sporadically when they first arrived, were sleeping through the night at the time of trial and eating on a regular schedule.

24

Greta testified that she and her family are bonded to the twins, that the twins seem bonded to them, and that if Mother's rights were terminated, she and her husband would like to adopt them.

In her first four points, Mother challenges the legal and factual sufficiency of the endangerment findings under subsections (D) and (E). As we have explained in a similar case,

> Endangerment means to expose to loss or injury, to jeopardize. The trial court may order termination of the parent-child relationship if it finds by clear and convincing evidence that the parent has knowingly placed or knowingly allowed the child to remain in conditions or surroundings that endanger the physical or emotional well-being of the child. Under subsection (D), it is necessary to examine evidence related to the environment of the child to determine if the environment was the source of endangerment to the child's physical or emotional well-being. Conduct of a parent in the home can create an environment that endangers the physical and emotional well-being of a child.

> . . . . Under subsection (E), the relevant inquiry is whether evidence exists that the endangerment of the child's physical or emotional well-being was the direct result of the parent's conduct, including acts, omissions, and failures to act. Termination under subsection (E) must be based on more than a single act or omission; a voluntary, deliberate, and conscious course of conduct by the parent is required.

> To support a finding of endangerment, the parent's conduct does not necessarily have to be directed at the child, and the child is not required to suffer injury. The specific danger to the child's well-being may be inferred from parental misconduct alone, and to determine whether termination is necessary, courts may look to parental conduct both before and after the child's birth. . . . A parent's decision to engage in illegal drug use during the pendency

25

of a termination suit, when the parent is at risk of losing a child, supports a finding that the parent engaged in conduct that endangered the child's physical or emotional well-being. Thus, parental and caregiver illegal drug use supports the conclusion that the children's surroundings endanger their physical or emotional well-being. A factfinder may also reasonably infer from a parent's failure to attend scheduled drug screenings that the parent was avoiding testing because the parent was using drugs. As a general rule, conduct that subjects a child to a life of uncertainty and instability endangers the child's physical and emotional well-being.

Because the evidence pertaining to subsections 161.001(1)(D) and (E) is interrelated, we conduct a consolidated review.[6]

Applying the appropriate standard of review,[7] we hold that, based upon our review of the record, the evidence is legally sufficient to support the trial court's endangerment findings regarding Mother under subsections (D) and (E). Also applying the appropriate standard of review,[8] we hold that the evidence is factually sufficient to support those findings. We overrule Mother's first four points. We do not reach her fifth and sixth points.[9]

---

[6] ... *In re J.W.*, No. 02-08-00211-CV, 2009 WL 806865, at *4–5 (Tex. App.—Fort Worth Mar. 26, 2009, no pet.) (mem. op.) (citations omitted).

[7] ... *See In re J.P.B.*, 180 S.W.3d 570, 573–74 (Tex. 2005).

[8] ... *See In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006); *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002).

[9] ... *See* Tex. R. App. P. 47.1; *In re E.M.N.*, 221 S.W.3d 815, 821 (Tex. App.—Fort Worth 2007, no pet.) (providing that along with a best interest finding, a finding of only one ground alleged under section 161.001(1) is sufficient to support a judgment of termination).

In her two final points, Mother contends that the evidence is legally and factually insufficient to support the best interest finding. Applying the appropriate standard of review,[10] we hold that, based upon our review of the record, the evidence is legally sufficient to support the best interest finding. We also hold, applying the appropriate standard of review,[11] that the evidence is factually sufficient to support the best interest finding. We overrule Mother's seventh and eighth points.

Having overruled Mother's dispositive points, we affirm the trial court's final orders terminating her parental rights.

PER CURIAM

PANEL: DAUPHINOT, J.; CAYCE, C.J.; and LIVINGSTON, J.

DELIVERED: September 17, 2009

---

[10] *See* Tex. Fam. Code Ann. § 263.307(a), (b) (Vernon 2008); *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006); *J.P.B.*, 180 S.W.3d at 573–74; *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976).

[11] *See* Tex. Fam. Code Ann. § 263.307(a), (b); *R.R.*, 209 S.W.3d at 116; *H.R.M.*, 209 S.W.3d at 108; *C.H.*, 89 S.W.3d at 28; *Holley*, 544 S.W.2d at 371–72.