# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

## NO. 02-13-00247-CV

IN THE INTEREST OF
K.D.L.M.

------------

FROM THE 16TH DISTRICT COURT OF DENTON COUNTY

------------

## MEMORANDUM OPINION[1]

------------

## I. Introduction

In a single issue, Appellant Father appeals the termination of his parental

rights to K.D.L.M.  We affirm.

---

[1]*See* Tex. R. App. P. 47.4.

## II. Procedural Background

After more than one investigation of the family by Child Protective Services (CPS), the Department of Family and Protective Services (DFPS) filed its original petition involving K.D.L.M. and his half-sister A.R.Y., and the trial court authorized the children's immediate removal from Father and Mother. DFPS filed an amended petition after it identified A.R.Y.'s father, who ultimately signed an affidavit of voluntary relinquishment and does not appeal the termination of his parental rights.

At the time of the jury trial, K.D.L.M. was two years old and A.R.Y. was four years old. Although Father knew about the trial setting, he did not appear. Father's CPS caseworker informed the trial court under oath that Father had told her three weeks before trial that he would not be attending because he had a felony warrant out for his arrest.[2] Before voir dire, Father's counsel informed the trial court that although he had managed to meet with Father, go over trial preparation materials, and talk about going to a jury trial,

> [s]ubsequent to that time and last week, I left him a voicemail every day making him aware that trial was to begin here today, that his failure to appear would not work well in his favor.
>
> The last two days I've attempted to make contact with him, his voicemail box has been full, and I've been unable to leave a message.

---

[2]After trial began, Father's community supervision officer testified that Father had a pending felony warrant related to his violation of community supervision and his failure to appear in court on his criminal case.

I've reached out to his probation officer, and [she] has been helpful, as much as she can, to facilitate contact between my client and myself.

I also spoke to [Father's] grandmother. I told his grandmother I've been unable to get in contact with him, he needed to be up here at trial. She said she would do everything she could to communicate that to his mother, let him know I was looking for him, for him to be up here at trial.

Father's counsel stated that he was ready to proceed to trial to present Father's case and hold the State to its burden of proof.

Based on the jury's verdict and the evidence submitted at trial, the trial court found that Father had endangered K.D.L.M., constructively abandoned K.D.L.M., and failed to comply with the provisions of a court order that specifically established the actions necessary for him to obtain K.D.L.M.'s return and that terminating his parental rights was in K.D.L.M.'s best interest. *See* Tex. Fam. Code Ann. § 161.001(1)(D), (E), (N), (O), (2) (West Supp. 2013). The trial court terminated Father and Mother's parental rights to K.D.L.M., and Mother's parental rights to A.R.Y.[3] This appeal followed.

### III. Termination of Parental Rights

In his single issue, Father argues that although he "believes the predicate grounds for termination were sufficiently presented," it is not in the best interest of the child for his rights to be terminated and that DFPS failed to prove that termination of his parental rights would be in K.D.L.M.'s best interest. Father

---

[3]Mother does not appeal the termination of her parental rights to either child.

3

then requests that we reverse the trial court's judgment and render judgment in his favor. Although Father presents his sole issue as a factual sufficiency challenge, because the relief he requests is for that of a legal sufficiency challenge, we will review the best interest determination under both standards.[4]

## A. Standards of Review

Termination decisions must be supported by clear and convincing evidence. Tex. Fam. Code Ann. § 161.001, § 161.206(a) (West 2008). Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *Id.* § 101.007 (West 2008).

In evaluating the evidence for legal sufficiency in parental termination cases, we determine whether the evidence is such that a factfinder could reasonably form a firm belief or conviction that the challenged ground for termination was proven. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). We review all the evidence in the light most favorable to the finding and judgment.

---

[4]In his conclusion, Father also states that this court should reverse the trial court's judgment and render judgment "because the underlying cause grounds fail factually (endangerment grounds) and as a matter of law (failure to comply with service plan following removal from the parent for abuse or neglect)." However, even assuming that he has sufficiently raised these unnumbered issues for our review, he does not challenge the constructive abandonment ground under section 161.001(1), and along with a best interest finding, a finding of only one ground alleged under section 161.001(1) is sufficient to support a judgment of termination. *See In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003); *In re E.M.N.*, 221 S.W.3d 815, 821 (Tex. App.—Fort Worth 2007, no pet.). Therefore, we will not address his challenges to the other grounds for termination under section 161.001(1).

4

*Id.* We resolve any disputed facts in favor of the finding if a reasonable factfinder could have done so. *Id.* We disregard all evidence that a reasonable factfinder could have disbelieved. *Id.* We consider undisputed evidence even if it is contrary to the finding. *Id.* That is, we consider evidence favorable to termination if a reasonable factfinder could, and we disregard contrary evidence unless a reasonable factfinder could not. *Id.*

We cannot weigh witness credibility issues that depend on the appearance and demeanor of the witnesses, for that is the factfinder's province. *Id.* at 573, 574. And even when credibility issues appear in the appellate record, we defer to the factfinder's determinations as long as they are not unreasonable. *Id.* at 573.

In reviewing the evidence for factual sufficiency, we give due deference to the factfinder's findings and do not supplant the verdict with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). We determine whether, on the entire record and as challenged by Father here, a factfinder could reasonably form a firm conviction or belief that termination of the parent-child relationship would be in the best interest of the child. Tex. Fam. Code Ann. § 161.001(2); *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002). If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction in the truth of its finding, then the evidence is factually insufficient. *H.R.M.*, 209 S.W.3d at 108.

5

## B. Evidence

The record reflects that before and during the instant case, Father, Mother, and Father's mother D.W. experienced serious mental health issues and used illegal drugs.[5] D.W. also had an earlier CPS history, and she threatened CPS workers during the case, resulting in her arrest in April 2013.[6]

Father and Mother were eighteen years old when A.R.Y. was born in November 2009, and other than the two or three weeks that Father worked at a fastfood restaurant, neither parent maintained employment during any of CPS's investigations. Both had dropped out of high school and were completely dependent on others for support.[7] Father had a history of attempting suicide, had

---

[5]Mother was diagnosed bipolar, started using marijuana when she was fourteen years old, and started using methamphetamine when she was sixteen years old. She switched from marijuana to K2, a synthetic marijuana that cannot be detected by a hair follicle drug test, because of CPS's involvement. Mother started using heroin after K.D.L.M. was born.

Mother described Father as a "mama's boy" and said that D.W. was insane and gave "bipolar a whole new meaning," that her behavior was unpredictable, and that she would pick fights that "didn't even make sense," particularly when she was drinking. Ashton Moore, the CPS caseworker, testified that D.W. initially refused to comply with a drug test prior to K.D.L.M.'s removal; when D.W. ultimately complied with a drug test, she tested positive for marijuana.

[6]D.W. filed a petition in intervention at the beginning of the case but nonsuited during the same month that she was arrested for threatening CPS workers.

[7]According to Mother, Father's grandmother was very wealthy and gave Father and D.W. a monthly allowance. When asked whether one of the reasons she had stayed with Father was so that she could continue to have access to his family's money, Mother stated, "I wouldn't put it that way, but in different words, yes."

started using marijuana when he was eleven years old, and had started using harder drugs by the time he was fifteen years old. We have set out the chronology of this case below, followed by specific testimony pertaining to the best interest factors.

## 1. 2010

CPS began its first investigation in February 2010. During that investigation, A.R.Y. tested positive for marijuana, Mother told Tina Harris, the CPS investigator, that she and Father had used marijuana together, and marijuana was found in the bed where A.R.Y. had been sleeping. Mother was arrested for possession of marijuana and received community supervision.

Instead of removing A.R.Y. from Mother,[8] CPS provided Family-Based Safety Services (FBSS) to her to reduce the risk in the home and prevent the necessity of future CPS intervention. These services included a substance abuse assessment, a psychological evaluation, counseling, and parenting classes. Father was not offered FBSS services because Mother told Harris that she and Father had broken up, and Father lied about his involvement with Mother. The first FBSS case lasted twelve to thirteen months instead of the usual three to six months because Mother tested positive for marijuana in October 2010.

---

[8]A.R.Y. primarily lived with Mother's grandparents until her placement in foster care a month or so before the termination trial with the grandparents' agreement.

7

## 2. 2011

On February 28, 2011, a misdemeanor complaint issued against Father for possession of two ounces or less of marijuana on or about January 28, 2011. Father was subsequently indicted for having, on or about the same day in January, intentionally or knowingly threatened harm in retaliation for someone having reported the occurrence of a crime.

In April 2011, Mother gave birth to K.D.L.M. K.D.L.M.'s hospital records reflect that a registered nurse witnessed Father cursing and threatening Mother and being verbally abusive to a floor nurse. Mother told the nurse that Father had a temper problem. Later that month, Harris investigated allegations that Mother and Father were smoking marijuana, that Father was using heroin, and that they were engaging in domestic violence. Mother, K.D.L.M., and Father were living with D.W. and D.W.'s teenage daughter at the time, and Mother told Harris that D.W. had been using marijuana and abusing pills. D.W. threatened Harris.

During the investigation, Mother, who was still on community supervision, denied having used drugs, and her hair follicle drug test was negative; she also denied any domestic violence and told Harris that while Father had used heroin in the past, he was not presently using it. Father denied using drugs or having any suicidal ideation. A month later, Father kicked Mother out and kept K.D.L.M. for the child's safety, and Mother admitted to her community supervision officer that she had used marijuana. In June or July 2011, the case closed after CPS

8

could not validate whether the children had been abused or neglected, and Father's grandmother bought the couple a house.

### 3. 2012

Another misdemeanor complaint issued against Father for possession of two ounces or less of marijuana alleged to have occurred on or about April 20, 2012, and sometime before September 2012, Mother and Father sold the house for $50,000. They bought a dilapidated trailer for $25,000, and with the remaining sales proceeds, they bought a car for $11,000, took the children shopping, and stocked up on diapers, formula, food, and toys. They spent the remaining $4,000 or $5,000 on drugs.

Mother said that she started using heroin to handle the stress caused by the trailer's condition and that for two months, she shot up several times a day while caring for the children. Father bought the heroin for her from his "people," while she sat in the car and waited if she went with him to get it. Mother said that Father used heroin on and off. When they first started using heroin, they were only spending a couple of hundred dollars a week on it, but towards the end, they spent around $700 per week. Mother said that D.W. had used heroin with her and Father after K.D.L.M. was born and that D.W. bought the heroin with money that Father's grandmother gave her.[9] Mother also suspected that Father had sold drugs.

---

[9]Moore, the CPS caseworker, said that Father's grandmother was not approved as an appropriate placement for K.D.L.M. because she was not willing

9

On September 21, 2012, CPS began another investigation after receiving a referral about Mother's drug and alcohol use and mental health when Mother went to the emergency room at the Presbyterian Hospital in Denton at 1:58 a.m. after drinking two 1.75 liter bottles of vodka in two days to cope with her heroin withdrawal. Mother was transferred to Millwood Hospital for psychiatric care, where a CPS investigator interviewed her. Mother told the investigator that she and K.D.L.M. had been living with D.W. and that she and Father had been together since her pregnancy with A.R.Y.

CPS investigator Shanna Hartley spoke with D.W. about her drug history, her CPS history, her mental health history, her criminal history, and how she had obtained possession of K.D.L.M. D.W. told her that only she and K.D.L.M. lived in the house, and she did not provide Hartley with any information on how to find Father. Based on CPS's information about D.W., Hartley was concerned about leaving K.D.L.M. in her care.

On September 28, 2012, Father pleaded guilty to the 2011 retaliation charge, a third-degree felony, and received three years of deferred adjudication community supervision. Father was placed on the "intensive supervision" caseload for this offense. Hartley said that she eventually made contact with Father and met with him at his attorney's office to determine whether Father could provide safe, stable, appropriate housing for his child.

to separate herself and K.D.L.M. from D.W. and she did not believe that D.W. had any problems.

10

Father told Hartley that he had dabbled with heroin a few times but that he was able "to pick it up and put it down," unlike Mother. He said that D.W. had picked up K.D.L.M. because Mother "was being psychotic" and that he had been caring for the children on a regular basis, getting up early with them because Mother had been sleeping until 1 p.m. due to her drug use. Father also told Hartley that he had been taking care of Mother for around three years but that during the FBSS case, they pretended not to be involved "so it wouldn't mess up" her case.

Hartley said that based on Father's statements about his drug use and Mother's statements about his drug use and D.W.'s drug use,[10] she did not believe that Father could provide a safe environment for K.D.L.M. Because of D.W.'s mental health issues and drug use, CPS also believed that K.D.L.M. would be in imminent danger if left in D.W.'s care. CPS removed K.D.L.M. and placed him into foster care; A.R.Y. remained with her maternal grandparents.

Mother told Hartley that she was afraid of D.W. because "she had seen things done to people that had done [D.W.] wrong." Hartley said that she was also afraid of D.W. and took her threats seriously and that DFPS had taken actions to protect its workers based on D.W.'s threats.

Hartley said that she frequently had to go through Father's attorney to speak to Father because Father would not provide a good contact phone number

---

[10]Mother told Hartley that she had used heroin, marijuana, K2, and alcohol with D.W. and Father.

11

or his address and that he would often hang up the phone on her when he lost his temper. CPS was unable to perform a hair follicle drug test on Father because he cut his hair short before the drug test, leaving insufficient hair to provide the sample. Hartley said that at the conclusion of her investigation, CPS determined that there was "reason to believe" the allegation of neglectful supervision of the children as to both Mother and Father but that CPS was "unable to determine" the truth of the allegation with regard to D.W.

Mother was arrested in October 2012 for violating her community supervision by failing a drug test. Mother said the last time Father was violent with her was before she went to jail in October 2012.

Father received his service plan in November 2012, and Mother and Father lived together from November to January 2013. Father's community supervision officer Christine Martin testified that Father was ordered to complete a number of courses that overlapped with his CPS service plan, including an anger management class, a mental health evaluation, and a drug and alcohol evaluation. Martin and Moore each testified that they tried to coordinate Father's CPS services with his community supervision to make sure that he would not have to perform duplicate services. Martin testified that Father had many conversations with her about his CPS situation, including that he loved his son and wanted him back, but that Father never accepted any responsibility for K.D.L.M.'s removal.

12

On December 19, 2012, Father pleaded nolo contendere to both his January 28, 2011 and his April 20, 2012 misdemeanor possession-of-marijuana charges and received twenty-four months of deferred adjudication community supervision. A day later, the State filed a motion to proceed to Father's adjudication of guilt on the retaliation offense, alleging that, among other things, Father had failed to report to his community supervision officer on several occasions, failed to begin his 160 hours of community service, failed to complete a drug and alcohol evaluation, and failed to participate in an anger management course as directed by the trial court. Martin testified that in addition to the allegations, Father had admitted to her that he had used marijuana, and he refused to take a drug test on several occasions.

### 4. 2013

Moore described the relationship between Mother and Father as "volatile" and said that in February 2013 during a visit at the CPS office and in the children's presence, Father had talked about how many people Mother had slept with during the course of their relationship and had called Mother inappropriate, vulgar names. Father accused Mother of sleeping with other people,[11] and Moore had to intervene multiple times during the visit to ask them to act like adults. In discussing the incident, Mother agreed that Moore had had to

---

[11]Mother was pregnant at the time of the trial but Father was not the unborn child's father.

13

intervene and said, "[Father] doesn't know how to wait, he doesn't know how to wait to talk about things."

During the same visit, D.W. attempted to assault Mother. After that incident, and after the trial court ordered D.W.'s visits ended, D.W. began issuing threats to CPS, including calling Moore to threaten her life, and Mother said that D.W. had threatened to kidnap K.D.L.M. from his foster home. Moore said that D.W. had made the kidnapping threats to her as well.

When Moore drove Father to take a drug test on March 8, 2013, Father admitted to her that he had been dealing drugs and told her that he preferred to deal methamphetamine because that was $350 per bag, while marijuana was only $100 per bag. Father told Moore that he would sell anything he got his hands on because that was how he survived. Moore said that she believed that Father understood what was expected of him in the case, what the trial court's orders were, and that his parental rights to K.D.L.M. were at stake.

Moore said that after Father's last visit with K.D.L.M., she helped the transporter put the children in the car, and as the transporter started driving away, she saw Father and D.W. start to follow the transporter's car. Moore called the police about this because D.W. had previously threatened to kidnap the child.

Father signed a drug use admission stating that he had possessed and used marijuana on May 18, 2013, and a capias for Father's arrest for failure to appear was issued by the trial court hearing his criminal case on May 31, 2013.

14

Mother told Moore in June 2013 that Father was using drugs. The termination trial began at the end of June.

### 5. Father's CPS Service Plan

Father reviewed his CPS service plan with Moore in November 2012. Among other things, the plan required Father to attend and cooperate with weekly counseling sessions; participate in "The Fatherhood FOCUS" classes; complete a drug and alcohol assessment; participate in AA/NA meetings five times per week and provide his caseworker with sign-in sheets; undergo a psychiatric evaluation; submit saliva, urine, and hair follicle samples for random drug testing; establish and maintain safe, stable, and appropriate housing and suitable employment for at least six months and during the pendency of the case; refrain from engaging in any and all criminal activities; comply with the terms of his probation; and participate in supervised visitation with K.D.L.M. for one hour every week at the Denton CPS office. The trial court expressly made the service plan a court order.[12]

Moore said that she discussed the service plan with Father and made sure that he understood what was expected but that Father did not sign the service plan. The trial court admitted Petitioner's Exhibits 5, 6, and 35, which were

---

[12]As of the March 7, 2013 and May 30, 2013 permanency hearings, the trial court had found that Father had not demonstrated adequate and appropriate compliance with the service plan.

Father's service plan, the one-page list of services that Moore drew up to make it easier for him to understand, and the CPS service authorizations.

Father barely started his service plan. He never participated in his drug and alcohol assessment, although he did participate in one of the fatherhood classes and a couple of counseling sessions. Moore stated that Father had been ordered to participate in a psychiatric evaluation because throughout the case, "he began having some very concerning psychiatric symptoms and so it was deemed necessary for him," but Father did not participate in the psychiatric evaluation, and he refused to submit to drug tests "[e]very time but two." Moore said that up until March 8, 2013, when CPS transported Father to take a drug test to make sure that he would submit, she did not believe that Father was changing his lifestyle because of "[h]is inconsistency with visits, his frequent mood swings and agitations. He was very dependent on everybody in his life." Father reported that he was homeless between September 24, 2012, and February 8, 2013, but Moore believed that he had been staying with D.W.

During Father's visits with K.D.L.M. in the first months of the case, Moore said that Father would hold K.D.L.M. the entire hour "and just cry and tell him, 'I'm your Daddy, I love you, I love my baby boy, you're so pretty,' and just repeat those phrases for an hour while holding [K.D.L.M.]." Moore said that Father transitioned to doing this for only half an hour, then fifteen minutes, and "then weaned himself off of crying the entire visit."

16

Father played with the children and did better in the visits than Mother because "[h]e was more attentive to them and did the things they wanted to do." However, Father did not visit K.D.L.M. again after the February 2013 visit until his last visit in May. At this visit, K.D.L.M. did not recognize Father. When Father asked K.D.L.M. if he loved Father and wanted to go home with him, K.D.L.M. shook his head and said no. When Father asked K.D.L.M. for a hug, K.D.L.M. refused, and Moore said that it appeared that K.D.L.M. had forgotten about Father after he failed to visit for three months. Father only attended fourteen out of a possible thirty-four visits with K.D.L.M.

### 6. Father's Behavioral and Mental Health Issues

Mother testified that Father had a terrible temper and had physically assaulted her but also that when he was not angry, he was a fun and amazing father. When asked where the children were when Father was physically violent with her, Mother said that they were in the house but did not see it, stating, "I don't know, but they weren't around us. [Father] might have been stupid, but he was never stupid enough to do it around the kids." Mother said that Father would never hurt the children, even though she agreed that he had had periods of mental instability and was unable to control his rage. Mother said that they would fight behind closed doors so that the children could not see them arguing, even though their arguments included yelling and screaming, and that she was afraid to call the police on Father or D.W. because they told her that she "would be taken care of" if she did. Mother agreed that Father used profanity in front of the

17

children, and she acknowledged that it was possible that the children had heard her and Father argue at home. She also acknowledged that her relationship with Father was toxic and said that "[a]s long as [Father] isn't around, I know [the children] will grow up and be happy, stress-free."

Mother stated that K.D.L.M. loved Father and only knew his "loving, caring side," that Father loved K.D.L.M., and that Father could be a good parent once he was away from D.W. However, she also stated that she did not believe Father could appropriately parent K.D.L.M. "[b]ecause he will not let himself get out from under his mother's wing."

Martin, Father's community supervision officer, said that over the course of monitoring Father from February 1, 2013, Father's mental condition had deteriorated. She described Father as follows:

> [Father], to me, seemed a bit paranoid. He made accusations against CPS that were highly irregular, for lack of better terms.
>
> He would come into my office and break down in tears and then he would leave my office cursing and yelling and screaming. Just the erratic fluctuation of his moods just in the 30 or 40 minutes that he would report that I would see that would cause me to believe that he was using drugs.
>
> . . . .
>
> [Father] told me that CPS was trying to kill him. [Father] believed that CPS was having him followed in a vehicle, attempting to run him off the road and causing him personal injury.
>
> [Father] believed that CPS had an involvement in a dog, a personal dog of his being killed and placed inside his backyard.

18

He went so far as saying that CPS had a high ranking judge killed because they were looking into CPS. He went as far as saying they were government-sanctioned kidnappers.

Martin said during their May 24, 2013 visit, Father did not appear to be in a fit state to care for a child.

Father told Martin that he and D.W. often argued loudly and would physically fight, and he showed her where D.W. had bitten him on the upper chest. Martin had Father's prescription proofs in her file—Father had prescriptions for Quetiapine, an antipsychotic; Lamotrigine, an anticonvulsant; Diazapam for anxiety; and Ropinirole for tremors and shaking. Martin said that in February 2013, Father acknowledged that he was glad that CPS had finally seen some of D.W.'s behaviors that he had grown up with and said "that he was happy that the child would never be returned to her."

Moore said that Father would call her constantly between 6:30 a.m. and 7:30 a.m. and if she did not pick up, he would fill up her voicemail box so that no one else could contact her, so she answered so that she would be able to talk to other CPS clients throughout the day. She said that during the case, Father continued to use drugs, had weird moods, missed visits, behaved badly, and continued his "back and forth with [Mother]."

### 7. Endangerment

Mother's counselor Melissa Beard explained that instability in a parent's romantic relationships can cause instability in the children's emotional well-being and that a parent's drug use can be endangering to young children, as can

domestic violence or even yelling and screaming. Beard stated, "Children create their basis for their own relationships through the example of their parents' relationship. If it is unstable or rocky, it can produce unstable relationships after that."

Harris, who investigated the first two CPS referrals, testified that a parent's taking of illegal drugs to deal with mental illness was endangering to children because both the drugs and the illness were volatile and putting them together without knowing how they would mix could trigger a lot of harm. Harris said that taking mental health medications along with illegal drugs could also result in a toxic combination.

Mother said that she had never seen Father sober, that he had often been under the influence of some sort of drug while in the children's presence, and that it was physically and emotionally dangerous to the children for Father to be on drugs while in the children's presence. Mother said that Father had used methamphetamine during the three months they were together during the case and in April 2013. Mother also stated that prior to the children's removal, the children always came first and that "[i]f it came to us getting high or our kids needed diapers, we found a way to get diapers and then get high."

Moore testified that DFPS wanted the jury to terminate Father's parental rights because he could not provide a safe and stable environment for K.D.L.M. and because he had failed to comply with any services, had continued to abuse drugs, and continued "to have extreme mental health instability." Further, Moore

testified, "[Father] has stated that he isn't able to take care of the kids, [K.D.L.M.] specifically.  He has endangered the children in the past and isn't appropriate for them."  As to both parents, Moore stated, "They're not doing services, they're not consistent on anything.  They're not meeting their own needs.  They're continuing to be involved in criminal activity."  DFPS's plan for the children was for them to be adopted by their foster parents.

### 8.  Foster Parents

Sarah,[13] K.D.L.M. and A.R.Y.'s foster mother, testified that she had been a licensed foster parent since October 2012, which required over twenty hours of training in first aid, CPR, behavior intervention techniques, and infant care.  She and her husband, who had been married for around twelve years, had to pass a background check to become foster parents, and they were dual-licensed to foster and adopt.  Both Sarah and her husband had college degrees and had worked outside of the home in professional careers for several years.  K.D.L.M., their first foster child, was placed in their home on October 25, 2012, after he was transferred from his first foster home.[14]  Moore testified that K.D.L.M. had made great strides in his foster home.

---

[13]We use a pseudonym for the foster mother's name to protect the children's identities.  *See* Tex. R. App. P. 9.8 & cmt.

[14]K.D.L.M.'s initial foster placement had been unable to handle his behavioral issues:  acting out by hitting, kicking, and biting, aggression involving the other children in the first foster home, and picking up imaginary objects.  K.D.L.M. also threw extremely long tantrums that were not typical for an eighteen-month-old child, characterized by uncontrollable rage and screaming at

21

A.R.Y. was formally placed with K.D.L.M. in the foster home on May 18, 2013, after a gradual transition period.[15]  Moore said that A.R.Y. was learning to share and get along with K.D.L.M.  Mother acknowledged that both of the children were very happy in the foster home.

Sarah said that based on her experience with raising a child of K.D.L.M.'s age, K.D.L.M.'s tantrums were more serious when he was first placed with her than those of a usual eighteen-month-old; he would throw himself onto the floor and bang his head on the floor while screaming.  Sarah said that K.D.L.M. was very smart and curious, that his temper tantrums were now the normal ones that two year olds have, and that he was able to speak clearly and verbalize his feelings instead of acting out.  K.D.L.M. called Sarah and her husband "Mommy and Dada."  Since being placed in the foster home, K.D.L.M. had not asked for Mother or Father.

Sarah said that she and her husband loved the children and that if K.D.L.M. and A.R.Y. were free for adoption, she and her husband wanted to adopt them and were willing to maintain a relationship with Mother's

---

the top of his lungs for hours at a time.  K.D.L.M. was taken to the emergency room, where medical professionals gave recommendations on how to address his behavioral issues.  CPS tested K.D.L.M. for drugs using a hair follicle test, but his test was negative for the substances that CPS tested for.

[15]Mother's grandparents did not believe, given their health and age, that they would be able to provide for A.R.Y. until she was eighteen years old and they were in agreement with CPS about placing her in the foster home with K.D.L.M.

grandparents. Sarah stated that A.R.Y. and K.D.L.M. were learning to share toys and interact as normal siblings and that they were "very bonded and get along great."

## C. Applicable Law

There is a strong presumption that keeping a child with a parent is in the child's best interest. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). Prompt and permanent placement of the child in a safe environment is also presumed to be in the child's best interest. Tex. Fam. Code Ann. § 263.307(a) (West 2008). The following factors, among others, should be considered in evaluating the parent's willingness and ability to provide the child with a safe environment: the child's age and physical and mental vulnerabilities; whether there is a history of abusive or assaultive conduct by the child's family or others who have access to the child's home; whether there is a history of substance abuse by the child's family or others who have access to the child's home; the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision; the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time; and whether an adequate social support system consisting of an extended family and friends is available to the child. *Id.* § 263.307(b); *R.R.*, 209 S.W.3d at 116.

Other, nonexclusive factors that the trier of fact in a termination case may use in determining the best interest of the child include:

(A) the desires of the child;

(B) the emotional and physical needs of the child now and in the future;

(C) the emotional and physical danger to the child now and in the future;

(D) the parental abilities of the individuals seeking custody;

(E) the programs available to assist these individuals to promote the best interest of the child;

(F) the plans for the child by these individuals or by the agency seeking custody;

(G) the stability of the home or proposed placement;

(H) the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and

(I) any excuse for the acts or omissions of the parent.

*Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976) (citations omitted).

These factors are not exhaustive; some listed factors may be inapplicable to some cases. *C.H.*, 89 S.W.3d at 27. Furthermore, undisputed evidence of just one factor may be sufficient in a particular case to support a finding that termination is in the best interest of the child. *Id.* On the other hand, the presence of scant evidence relevant to each factor will not support such a finding. *Id.*

**D. Analysis**

Father argues that although DFPS elicited testimony that its plan was for adoption by the foster placement, there was no guaranty that the foster parents would adopt the child or maintain a relationship with K.D.L.M.'s maternal

24

grandparents, making DFPS's plan for the child "unclear and illusory at best." He also complains that the CPS caseworker's statements that Father's parental rights should be terminated because he had failed to comply with services, had continued to abuse drugs, and had extreme mental health instability were conclusory, lacked foundation, and had no basis in the record for support other than Mother's statements about his drug use.

We disagree that Moore's statements were conclusory in that, as set out above, Moore gave considerable elaboration on her conversations with and observations of Father. Further, Mother's testimony corroborated far more than just Father's drug use, and Father's community supervision officer also testified about Father's drug use, his mental deterioration, and his unhealthy relationship with D.W.

Father spent most of the case living with D.W. or homeless, neither of which presented a safe environment for K.D.L.M. Father had drug and mental health problems that prevented him from providing a safe environment for K.D.L.M. and created physical and emotional impediments to his ability to act in K.D.L.M.'s best interest. These impediments included, but were not limited to, his criminal activities, which prevented him from appearing at the termination trial. *See* Tex. Fam. Code Ann. § 263.307(b). D.W., Father's mother and primary support during the case, had a history of making threats and physically assaulting Father and others, as well as drug and mental health issues of her own, and neither Father nor D.W. appeared willing to make the necessary

25

changes in their lifestyles to enable K.D.L.M.'s return. *See id.* Therefore, viewing all of the evidence in the light most favorable to the finding and judgment, we conclude that the jury could have reasonably formed a firm belief or conviction that termination of Father's parental rights would be in K.D.L.M.'s best interest. *See J.P.B.*, 180 S.W.3d at 573. Because the evidence is legally sufficient to support the best interest finding, we overrule this portion of Father's sole issue.

Further, although K.D.L.M., a two-year-old child, was unable to express his desires at trial, Moore testified that he had made great strides in the foster home, his foster mother said that K.D.L.M. had stopped acting out, and Mother acknowledged that both K.D.L.M. and his half-sister were happy together in the foster home. K.D.L.M. did not recognize Father during their last visit, and he called the foster parents "Mommy and Dada."

The record reflects that the foster parents had jobs and a stable relationship, loved the children, and wanted to adopt them and keep them together. *See Holley*, 544 S.W.2d at 371–72. In contrast, Father and Mother had a toxic relationship, the instability of which presented both physical and emotional danger to K.D.L.M., even though Mother testified that Father would never hurt the children despite having physically assaulted her. *See id.* The toxicity of their relationship was further aggravated by their drug use to treat their mental health issues, both of which continued throughout the case. *See id.* Father failed to take the measures necessary to secure the return of the child to

26

him despite his community supervision officer's and CPS caseworker's efforts to make it easier for him, and he stopped visiting the child for three months. Giving due deference to the jury's finding and having reviewed the entire record, we conclude that the jury could have reasonably formed a firm conviction or belief that terminating Father's parental rights to K.D.L.M. was in the child's best interest. *See H.R.M.*, 209 S.W.3d at 108; *In re S.B.*, 207 S.W.3d 877, 887–88 (Tex. App.—Fort Worth 2006, no pet.) ("A parent's drug use, inability to provide a stable home, and failure to comply with his family service plan support a finding that termination is in the best interest of the child."). Because the evidence is factually sufficient to support the best interest finding, we overrule the remainder of Father's sole issue.

## IV. Conclusion

Having overruled Father's sole issue, we affirm the trial court's judgment.

PER CURIAM

PANEL: MCCOY, DAUPHINOT, and GARDNER, JJ.

DELIVERED: November 27, 2013