

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
### FORT WORTH

## NO. 02-13-00302-CV

IN THE INTEREST OF C.M.D. AND
H.M.A., CHILDREN

-----------

FROM THE 323RD DISTRICT COURT OF TARRANT COUNTY

----------

## MEMORANDUM OPINION[1]

----------

Appellants S.A. (Mother) and T.D. (Father) appeal the trial court's order terminating their parental relationships with sons C.M.D. and H.M.A. In her sole issue, Mother contends that her right to counsel was violated by the absence of appointed counsel for a significant period, that this court's directive in the prior appeal that the retrial occur within 180 days of our mandate interfered with the

---

[1]*See* Tex. R. App. P. 47.4.

trial court's discretion, that the twelve-month period referenced in section 263.401 of the family code should have been restarted after remand, and that she did not have ample opportunity to achieve family reunification before the original termination order or to comply with the trial court's post-remand order establishing actions necessary for her to obtain the return of the children. Father contends in five points that the evidence is insufficient to support the trial court's findings that he

- knowingly placed or knowingly allowed the children to remain in conditions or surroundings which endangered their physical or emotional well-being;[2]

- engaged in conduct or knowingly placed the children with persons who engaged in conduct which endangered their physical or emotional wellbeing;[3]

- constructively abandoned the children, who had been in the permanent or temporary managing conservatorship of the Texas Department of Family and Protective Services (TDFPS) for not less than six months, and: (1) TDFPS had made reasonable efforts to return the children to Father, (2) he had not regularly visited or maintained significant contact with them, and (3) he had demonstrated an inability to provide the children with a safe environment;[4] and

- failed to comply with the provisions of a court order that specifically established the actions necessary for him to obtain the return of the children, who had been in the permanent or temporary managing conservatorship of TDFPS for not less than nine months as a result

---

[2] *See* Tex. Fam. Code Ann. § 161.001(1)(D) (West Supp. 2013).

[3] *See id.* § 161.001(1)(E).

[4] *See id.* § 161.001(1)(N).

2

of their removal from Father under Chapter 262 for abuse or neglect[5] and that termination is in the children's best interest.[6] Because we hold that Mother forfeited her issue and that the evidence is legally and factually sufficient to support the termination of Father's parental rights, we affirm the trial court's judgment.

## I.      Mother forfeited her complaints.

After the original trial in this matter, the trial court issued a default judgment, the parents filed a motion for new trial, and the trial court denied it. The parents appealed. On November 29, 2012, this court held that the trial court abused its discretion by denying Mother and Father's motion for new trial, reversed the trial court's default judgment, and remanded this case for a new trial.[7] In her sole issue, Mother contends that our directive that the retrial occur within 180 days of our mandate interfered with the trial court's ability to extend the case, that the twelve-month period referenced in section 263.401 of the family code should have been restarted based on the specifics of this case and because she lacked counsel from sometime before May 2012 until March 19,

---

[5] *See id.* § 161.001(1)(O).

[6] *See id.* § 161.001(2).

[7] *In re C.M.D.*, No. 02-12-00237-CV, 2012 WL 5949506, at *4 (Tex. App.— Fort Worth Nov. 29, 2012, no pet.).

2013,[8] that she did not have ample opportunity to achieve family reunification before the original termination order because she lacked counsel, and that she could not comply with the trial court's May 2, 2013 order establishing actions necessary for her to obtain the children's return because she had only twenty days to complete those actions before the retrial.

We note that Mother had counsel while her first appeal was pending and that our order instructing the trial court to begin a retrial within 180 days of our mandate was required by rule 28.4(c) of the rules of appellate procedure.[9] Without addressing the factual or legal merits of the remainder of her issue, we hold that Mother forfeited all her complaints by not presenting them to the trial court and obtaining a ruling.[10] We overrule Mother's sole issue.

---

[8]*See* Tex. Fam. Code Ann. § 263.401(a) (West 2008) (mandating dismissal of a parental termination or conservatorship suit filed by TDFPS unless the trial court has commenced trial or granted an extension by the first Monday following the first anniversary of the trial court's rendition of a temporary order appointing TDFPS as temporary managing conservator).

[9]*See* Tex. R. App. P. 28.4(c).

[10]*See* Tex. R. App. P. 33.1(a)–(b); *Bushell v. Dean*, 803 S.W.2d 711, 712 (Tex. 1991) (op. on reh'g); *Frazier v. Yu*, 987 S.W.2d 607, 609–10 (Tex. App.—Fort Worth 1999, pet. denied).

## II. Father's Appeal

### A. The evidence is legally and factually sufficient to support the trial court's finding under section 161.001(1)(O) of the family code.

In Father's third issue, he contends that the evidence is legally and factually insufficient to support the trial court's finding that he failed to comply with the provisions of a court order that specifically established the actions necessary for him to obtain the return of the children, who had been in the permanent or temporary managing conservatorship of TDFPS for not less than nine months as a result of their removal from Father under Chapter 262 for abuse or neglect.[11]

After a hearing on April 4, 2013, which Father attended, the trial court signed on May 2, 2013 an order establishing actions necessary for him to obtain the return of the children. The order provides,

> Pursuant to Texas Family Code, Section 161.001 (O), the court makes the following orders to establish the necessary actions for the parent to obtain return of the child who has been in the temporary managing conservatorship of the Department of Family and Protective Services for not less than 9 months as a result of the child's removal from the parent pursuant to Chapter 262 for abuse and neglect.

> The Court orders . . . Respondent Father . . . to comply with the following:

> I. [FATHER] will abstain from criminal conduct.

---

[11] *See* Tex. Fam. Code Ann. § 161.001(1)(O).

2. [FATHER] will abstain from the use of illegal drugs or legal drugs for which he does not have a prescription.

3. [FATHER] to obtain and maintain appropriate housing for himself [and his sons].

4. Within ten (10) days of this order, [FATHER] will provide CPS written documentation of said housing, i.e. a lease or similar documentation that lists him as an occupant.

5. [FATHER] will obtain gainful employment.

6. Within ten (10) days of obtaining gainful employment, [FATHER] will provide CPS written documentation of said employment.

7. If employed, by the fifth day of each month, [FATHER] will provide to CPS copies of his paystubs from the previous month.

8. If [FATHER] is unable to obtain gainful employment, [he] will provide CPS written documentation of sources of income with which he will provide food, shelter, clothing and basic necessities for himself[ and his sons].

9. [FATHER] will, by the fifth day of each month, provide to CPS copies of the previous month's statements for any and all banks accounts held in his name or jointly with another person.

10. [FATHER] will, by April 19, 2013, provide copies of his 2010, 2011 and 2012 Federal Income Tax return to CPS.

11. [FATHER] will, by April 19, 2013, provide a written list of potential relative or fictive kinship placement options for [his sons]. The list shall the individuals' names, addresses, phone numbers, copies of Social Security cards, birth certificates, and driver's license.

12. [FATHER] will maintain weekly contact with Case Worker Rita E. Thompson, 401 W. Sanford, #2400, Arlington, TX 76011, 817-548-4516 and/or via e-mail to

rita.thompson@dfps.state.tx.us to provide service plan progress updates.

In his testimony, Father admitted to not providing "a list of potential relative or fictive kinship placement options," a copy of his lease, written documentation of his employment, pay stubs, or copies of his 2010, 2011, or 2012 federal income tax returns. He also admitted that he had not maintained weekly contact with his caseworker, Rita Thompson. Thompson testified that he had not called her, written her, or come by the TDFPS office in the year preceding retrial.

Father's entire argument on this issue is set out below:

> [Father] testified that he has never been arrested nor used illegal drugs. The record evidence further revealed that [Father] has a stable job and [has] been employed at the same position since 2009. In addition, [Father] testified that he rents a 3 bedroom home and lives in that home by himself.

> Therefore, based on the facts in the record, the evidence is legally and factually insufficient to establish that [Father] did not complete his Court Ordered Services.

While Father argues that he completed all of the services requested of him by TDFPS, he does not contend that he complied with the trial court's May 2, 2013 order. As this court has previously explained, subsection (O) of the statute is not satisfied by substantial compliance.[12] Reviewing all the evidence in a light favorable to the finding and judgment, we therefore hold that the trial court could have reasonably formed a firm belief or conviction that Father failed to comply

---

[12]*In re K.H.*, No. 02-11-00427-CV, 2012 WL 2849283, at *4 (Tex. App.—Fort Worth July 12, 2012, no pet.).

with the May 2, 2013 order.[13] We consequently hold that the evidence is legally sufficient to support that finding. And giving due deference to the trial court's findings in our review of the entire record, we likewise hold that the trial court could have reasonably and firmly believed that Father failed to comply with the May 2013 order.[14] We therefore hold that the evidence is factually sufficient to support that finding. We overrule Father's third issue.

**B.    The evidence is legally and factually sufficient to support the trial court's finding that termination of Father's parental rights is in the children's best interests.**

In his fifth issue, Father argues that the evidence is legally and factually insufficient to support the trial court's finding that termination of his parental rights to C.M.D. and H.M.A. is in their best interests. There is a strong presumption that keeping a child with a parent is in the child's best interest.[15] Prompt and permanent placement of the child in a safe environment is also presumed to be in the child's best interest.[16]

---

[13]*See* Tex. Fam. Code Ann. § 161.001(1)(O); *see also In re E.N.C.*, 384 S.W.3d 796, 808 (Tex. 2012); *In re J.P.B.*, 180 S.W.3d 570, 573–74 (Tex. 2005) (together providing standard of reviewing evidence for legal sufficiency when burden of proof is clear and convincing).

[14]*See In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006); *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002) (together providing standard of reviewing evidence for factual sufficiency when burden of proof is clear and convincing).

[15]*In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006).

[16]Tex. Fam. Code Ann. § 263.307(a) (West 2008).

We review the entire record to determine the child's best interest.[17] The same evidence may be probative of both the subsection (1) ground and best interest.[18] Nonexclusive factors that the trier of fact in a termination case may also use in determining the best interest of the child include:

(A)     the desires of the child;

(B)     the emotional and physical needs of the child now and in the future;

(C)     the emotional and physical danger to the child now and in the future;

(D)     the parental abilities of the individuals seeking custody;

(E)     the programs available to assist these individuals to promote the best interest of the child;

(F)     the plans for the child by these individuals or by the agency seeking custody;

(G)     the stability of the home or proposed placement;

(H)     the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and

(I)     any excuse for the acts or omissions of the parent.[19]

These factors are not exhaustive; some listed factors may be inapplicable to some cases.[20]  Furthermore, undisputed evidence of just one factor may be

---

[17]*In re E.C.R.*, 402 S.W.3d 239, 250 (Tex. 2013).

[18]*C.H.*, 89 S.W.3d at 28; *see E.C.R.*, 402 S.W.3d at 249.

[19]*Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976) (citations omitted); *E.N.C.*, 384 S.W.3d at 807; *see E.C.R.*, 402 S.W.3d at 249 (stating that in reviewing a best interest finding, "we consider, among other evidence, the *Holley* factors").

sufficient in a particular case to support a finding that termination is in the best interest of the child.[21]   On the other hand, the presence of scant evidence relevant to each factor will not support such a finding.[22]

As Father points out, there was evidence that he had been employed continuously since the family arrived in Texas in November 2009, that he lived alone in a three-bedroom home, and that he had completed his service plan, including parenting classes.  There was also evidence that Father could support his sons financially, that he had a support system in Fort Worth, and that he loved his sons.  Additionally, there was some evidence from which one could infer that C.M.D. was attached to Mother and Father.  In the first few weeks after the removal, he would cry and not want to return to the first foster home after visits with his parents, asking why he could not return to his home.  He would then lie on his bed and cry after returning to the foster home.

But the trial court also considered the following evidence at the retrial.

After the family moved from Arizona to Texas in November 2009, the boys received no medical care until late January 2011 when Father and Mother took H.M.A. to the emergency room.  At that time, C.M.D. was almost five years old, and H.M.A. was about thirty-two months old.  His hands, which both parents had

---

[20]*C.H.*, 89 S.W.3d at 27.

[21]*Id.*

[22]*Id.*

noticed him sucking repeatedly for a month or two, had been severely burned. Mother ultimately pled guilty to intentionally or knowingly burning his hands by immersing them in liquid. C.M.D. stated that he and his brother had been removed because "[their] house wasn't safe. The water hurt [H.M.A]."

Dr. Sophia Grant, a pediatrician at Cook Children's Hospital in Fort Worth, testified that she believed that H.M.A. was starved. At the time of the January 2011 removal, he weighed less than sixteen pounds, the weight of an average six- or seven-month-old. He was diagnosed with severe failure to thrive (FTT). Mother admitted that he had been diagnosed with FTT in Arizona, before the family ever moved to Texas. He was also legally blind, unable to walk, did not crawl normally, according to Thompson, and was developmentally delayed. Finally, his brain showed evidence of nonaccidental trauma.

After the removal, H.M.A. experienced "fair weight gain" of about thirteen grams a day in the first foster home and had "great weight" gain in his second foster home, where the foster mother had prior experience with FTT children. Dr. Grant testified that she

> saw him on four occasions, and [H.M.A.] gained weight at an average of about 22 grams per day. A child of his age normally gains weight at a rate of 38 grams per month. So he was gaining almost two-thirds of what [a child of his age normally would] gain in a month in a day. It was very dramatic.

She testified that the fact that he was severely underweight should have been obvious to a layperson. Dr. Grant concluded that most of H.M.A.'s FTT was due to caloric deprivation, noting that in the month of her final visit with

11

H.M.A., which was six months after her initial visit with him, he gained 232 grams in one month; normal gain for a child his age would have been 38 grams per month.

Father acknowledged that H.M.A. was "smaller than he should be" when he was removed but insisted that H.M.A. was a normal size, considering his premature birth. Father testified that a pediatrician had told Mother and him that it would take time for a premature child to "develop normal activities, normal types of walking, normal types of speech." But again, neither C.M.D. nor H.M.A. had received medical care or treatment of any kind since the family had arrived in Texas fourteen to fifteen months before the removal.

Father agreed that a parent should notice if a child H.M.A.'s age had the weight of a six-month-old and that that fact should concern a parent enough to seek medical treatment. Father admitted that he had noticed that H.M.A. was underweight when he was around two years old but stated that the boy looked thin, not sick. Father conceded that by the time of the removal, H.M.A. looked sick. But Father did not believe that H.M.A. had been starved before the removal. Mother testified that she had complained to Father all the time about H.M.A. not gaining weight.

H.M.A.'s lenses had been removed when he was an infant in Arizona and never replaced. Father claimed ignorance of the removal of H.M.A.'s lenses, but Mother testified that she regularly took H.M.A. to the eye doctor until they moved to Texas in November 2009 and that Father drove her to the children's doctors'

12

appointments.  Dr. Grant testified that the lenses should have been replaced soon after surgery and that it was very significant medical neglect for a parent not to return his child to the doctor after surgery to have lenses put in.  She explained that a child needs to see to develop the area of the brain responsible for vision and that blindness could be caused by not having lenses timely replaced.

Father also admitted that he knew the boys needed shots from November 2009 through January 2011.

Father had not lived apart from the children before the removal.

The evidence also showed that Father had not visited his sons for more than a year and had made no requests to see them since May 16, 2012, his last visit before his rights were terminated in the first trial.  On the other hand, the boys had been in their foster home for all but two months of the twenty-eight months since their removal.  The foster parents wanted to adopt the boys if the parental rights of Mother and Father were terminated, and TDFPS shared that goal.

C.M.D.'s first foster mother believed that he may have been emotionally abused before arriving in her home because he appeared afraid to ask for food, get up from the table, or get out of bed.  Shortly after C.M.D. came into care, Dr. Greta Kerwin of Treehouse Psychological Services evaluated his development. His cognitive functioning was found to be "below average."  "His verbal and nonverbal abilities [were] evenly developed."  Dr. Kerwin believed that it was

"likely that some of his deficits [were] due to lack of exposure and w[ould] improve with ongoing learning opportunities."

Doctor Kerwin also performed a developmental evaluation of H.M.A. soon after the removal. She gave him a provisional diagnosis of moderate mental retardation, noting that "his deficits in part [could] be due to environmental neglect" and concluded that he had suffered both physical abuse and neglect. In Father's psychological evaluation, however, which occurred subsequent to his sons' evaluations, he "stated [that] his children did not have any developmental delays or medical conditions."

By the retrial, however, both boys had improved. C.M.D. was doing "great" and was "academically on target." Physically he was tall, slender, and very active. He had been diagnosed with ADHD in foster care and took Ritalin but had no other health issues.

H.M.A. still suffered from "significant developmental delay," but because he had shown "some improvement[,] the diagnosis [was] transitioned into intellectual disability, severity unspecified." H.M.A. also experienced more concrete developmental improvements. While in his current foster home, he stood alone, walked unsupported, and spoke his first words, all at the age of three years. The foster parents were also ensuring that he received speech therapy, occupational therapy, and physical therapy at school and at home.

H.M.A.'s lenses were replaced in foster care, and he had another eye surgery to improve his vision. By August 2012, his vision seemed to have

14

improved somewhat because he was running into walls less. The foster mother reported that he could nevertheless see only blobs. She was planning to acquire a service dog for H.M.A. because of his ongoing visual issues.

H.M.A. had become attached to the foster family. The first recommendation of his April 25, 2013 psychological assessment provides,

> Stability with the foster mother. [H.M.A.] has a developing attachment to this foster family. This is a child who has had severe trauma in the family of origin. His attachment is somewhat insecure to the foster parents, and he has some separation anxiety. He needs stability with this foster home to give him an opportunity to further strengthen his attachment and sense of trust in the home. He needs an opportunity to be able to develop a secure attachment. It would be emotionally devastating for him to be moved out of this home.

Reviewing all the evidence in a light favorable to the finding and judgment, we hold that the trial court could have reasonably formed a firm belief or conviction that termination of the parent-child relationships between Father and his sons is in their best interests.[23] We consequently hold that the evidence is legally sufficient to support that finding. And giving due deference to the trial court's findings in our review of the entire record, we likewise hold that the trial court could have reasonably and firmly believed that terminating the parent-child relationships between Father and his sons is in their best interests.[24] We

---

[23]*See* Tex. Fam. Code Ann. § 161.001(2); *see also E.N.C.*, 384 S.W.3d at 808; *J.P.B.*, 180 S.W.3d at 573–74.

[24]*See H.R.M.*, 209 S.W.3d at 108; *C.H.*, 89 S.W.3d at 28.

15

therefore hold that the evidence is factually sufficient to support that finding. We overrule Father's fifth issue.

## C. Issues Not Reached

Because a best interest finding and a finding of only one ground alleged under section 161.001(1) of the family code are sufficient to support a judgment of termination,[25] we do not reach Father's first, second, and fourth issues,[26] which challenge the findings under subsections (D), (E), and (N).[27]

## III. Conclusion

Having overruled Mother's sole issue and Father's third and fifth issues, which are dispositive, we affirm the trial court's judgment.

/s/ Lee Ann Dauphinot
LEE ANN DAUPHINOT
JUSTICE

PANEL: LIVINGSTON, C.J.; DAUPHINOT and GABRIEL, JJ.

GABRIEL, J., concurs without opinion.

DELIVERED: February 6, 2014

---

[25] *In re E.M.N.,* 221 S.W.3d 815, 821 (Tex. App.—Fort Worth 2007, no pet.).

[26] *See* Tex. R. App. P. 47.1.

[27] *See* Tex. Fam. Code Ann. § 161.001(1)(D), (E), (N).